Case No. 24-1615

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

WHITNEY HODGES,
as Personal Representative of the Estate of Honestie Hodges,

*Plaintiff-Appellee,*

-vs-

CITY OF GRAND RAPIDS, a Michigan Municipal Corporation;
DAVID RAHINKSKY, Former Police Chief, in his official capacity,

*Defendants,*

OFFICER SPENCER SELLNER; OFFICER ANTHONY BARBERINO; and
OFFICER JEFFREY DIONNE, all in their individual and official capacities;

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Western District of Michigan
U.S. District Court Case No.: 1:23-cv-01230

_____

## DEFENDANTS-APPELLANTS' BRIEF ON APPEAL
### ***Oral Argument Requested***

Counsel For
Defendants-Appellants:

Elizabeth J. Fossel (P41430)
Sarah J. Hartman (P71458)
Melissa A. Powell (P57048)
Megan Luptowski (P84826)
*Attorneys for Defendants-Appellants*
Grand Rapids Department of Law
300 Monroe Ave. NW, Ste. 620
Grand Rapids, Michigan 49503
(616) 456-3181

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

WHITNEY HODGES,
as Personal Representative of the Estate of Honestie Hodges,

*Plaintiff-Appellee,*

-vs-

CITY OF GRAND RAPIDS, a Michigan Municipal Corporation;
DAVID RAHINKSKY, Former Police Chief, in his official capacity,

*Defendants,*

OFFICER SPENCER SELLNER; OFFICER ANTHONY BARBERINO; and
OFFICER JEFFREY DIONNE, all in their individual and official capacities;

*Defendants-Appellants.*

---

## CORPORATE DISCLOSURE

Pursuant to Fed. R. App. P. 26.1 and 6 Cir. R. 26.1(a), the Defendants-Appellants make the following disclosure:

1. Are said parties subsidiaries or affiliates of a publicly owned corporation? **No.**
2. Is there a publicly-owned corporation, not a party to the appeal that has a financial interest in the outcome? **No.**

*/s/ Sarah J. Hartman*                     October 1, 2024
Sarah J. Hartman (P71458)               Date

# <u>TABLE OF CONTENTS</u>

**Page(s)**

CORPORATE DISCLOSURE ................................................................. ii

TABLE OF CONTENTS.................................................................... iii

TABLE OF AUTHORITIES .............................................................. vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................ xi

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF ISSUES PRESENTED................................................2

I.    STATEMENT OF THE CASE ........................................................4

    A. GRAND RAPIDS POLICE OFFICERS RESPONDED TO A
    STABBING AND WERE INFORMED THAT THE SUSPECT MAY
    HAVE FLED TO THE HODGES'S RESIDENCE. ................................ 4

    B. OFFICERS ARRIVED AT THE HODGES'S RESIDENCE IN
    SEARCH OF A SUSPECT ARMED WITH A KNIFE. ........................ 5

    C. THE OFFICERS WORKED TO DILIGENTLY CONCLUDE THEIR
    INVESTIGATION AT THE HODGES'S ADDRESS. ........................... 8

    D. PROCEDURAL POSTURE: THE DISTRICT COURT FOUND
    THAT THE OFFICERS WERE NOT ENTITLED TO DISMISSAL
    BASED ON QUALIFIED IMMUNITY.................................................. 10

II.   SUMMARY OF THE ARGUMENT ...............................................11

III.  ARGUMENT.........................................................................15

    A. STANDARD OF REVIEW:  A DISTRICT COURT'S DENIAL OF
    QUALIFIED IMMUNITY AT THE MOTION TO DISMISS STAGE
    IS REVIEWED BY THIS COURT DE NOVO. ..................................... 15

    B. OFFICERS SELLNER, BARBERINO, AND DIONNE WERE
    EACH ENTITLED TO QUALIFIED IMMUNITY AS A MATTER
    OF LAW................................................................................... 17

1. Qualified Immunity Requires a Plaintiff to Plead Facts that a Constitutional Right was Violated and that the Right was Clearly Established at the Time.........................................................................17

2. A Right is Clearly Established When Every Reasonable Officer Would Have Known that His Actions Violated a Protected Right. .................20

3. Then-Existing Case Law Favored the Lawfulness of the Officers' Actions.............................................................................................22

4. Officers Sellner, Barberino, and Dionne are Each Entitled to Qualified Immunity and Dismissal of the Seizure Claims. ...................................25

   a. Officer Sellner. ..................................................................32

   b. Officer Barberino...............................................................33

   c. Officer Dionne....................................................................35

5. Officers Sellner and Barberino are each Entitled to Qualified Immunity on Plaintiff's Excessive Force Claim. ...............................36

   a. Officer Sellner did not Violate a Clearly Established Right..........40

   b. Officer Barberino did not use Excessive Force. ...........................42

C. STANDARD OF REVIEW: THIS COURT REVIEWS THE DISTRICT COURT'S DECISION NOT TO VIEW MATERIALS OUTSIDE THE PLEADINGS FOR ABUSE OF DISCRETION ...... 45

D. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO CONSIDER THE INCIDENT REPORT OR THE CAD EVENT REPORT. ............................................................... 45

1. On a Motion to Dismiss, the Court Considers Materials Outside the Pleadings in Some Circumstances. ............................................... 45

2. The Incident Report and CAD Report are both Public Records. ......... 48

3. The CAD Report was Referred to in the Complaint and is Central to Plaintiff's Claims. ....................................................................... 50

4. The Reports Simply Filled in the Contours of Plaintiff's Complaint. 51

iv

5. Plaintiff had Actual Knowledge of the CAD Report and the Incident Report, Relying on Both in Framing Her Complaint..............................52

IV.    CONCLUSION................................................................................54

CERTIFICATE OF COMPLIANCE.......................................................55

CERTIFICATE OF SERVICE ................................................................56

ADDENDUM .........................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amini v. Oberlin College*,
   259 F.3d 493 (6th Cir. 2001) ...............................................................16

*Andrews v. Hickman Cnty., Tenn.*,
   700 F.3d 845 (6th Cir. 2012) ...............................................................20

*Ashcroft v. al-Kidd*,
   563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ...................18

*Ashford v. Raby*,
   951 F.3d 798 (6th Cir. 2020) ..........................................................22, 25

*Bassett v. National Collegiate Athletic Ass'n.*,
   528 F.3d 426 (6th Cir. 2008) ...............................................................46

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ...............15, 25

*Bell v. City of Southfield*,
   37 F.4th 362 (6th Cir. 2022) ................................................................16

*Bey v. Falk*,
   946 F.3d 304 (6th Cir. 2019) ..........................................................26, 27

*Biegas v. Quickway Carriers, Inc.*,
   573 F.3d 365 (6th Cir. 2009) ...............................................................49

*Brosseau v. Haugen*,
   543 U.S. 194, 125 S.Ct. 569, 160 L.Ed.2d 583 (2004).......................21

*Burn v. Lafler*,
   328 F. Supp. 2d 711 (E.D. Mich. 2004) ..............................................24

*Collins v. Nagle*,
   892 F.2d 489 (6th Cir. 1989) ...............................................................41

*Cortec Industries, Inc. v. Sum Holding, L.P.*,
  949 F.2d 42 (2nd Cir. 1991) ................................................................47

*Courtright v. City of Battle Creek*,
  839 F.3d 513 (6th Cir. 2016) ........................................................43, 44

*District of Columbia v. Wesby*,
  583 U.S. 48, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) ........................44

*Dortch v. Fowler*,
  588 F.3d 396 (2009)............................................................................48

*Elkins v. United States*,
  364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) ........................26

*Fritz v. Charter Tp. of Comstock*,
  592 F.3d 718 (6th Cir. 2010) ..............................................................15

*Gardenshire v. Schubert*,
  205 F.3d 303 (6th Cir. 2000) ..............................................................26

*Gordon v. Louisville/Jefferson Cnty. Metro Gov*'t,
  486 F.App'x 534 (6th Cir. 2012) .........................................................33

*Graham v. Connor*,
  490 U.S. 386, 109 S.Ct. 1865, 104 LEd.2d 443 (1989)...........20, 37, 38

*Guertin v. State of Michigan*,
  912 F.3d 907 (6th Cir. 2019) ..............................................19, 21, 36

*Hope v. Pelzer*,
  536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ...........19, 20, 22, 25, 43

*Hughes v. City of North Olmsted*,
  93 F.3d 238 (6th Cir.1996) ................................................................20

*Ingram v. City of Columbus*,
  185 F.3d 579 (6th Cir. 1999) ..............................................................33

*Jarvis v. Wellman*,
  52 F.3d 125 (1995)..............................................................................22

*Johnson v. Mosely*,
  790 F.3d 649 (6th Cir. 2015) ........................................................15, 19

*LaPlante v. City of Battle Creek*,
  30 F.4th 572 (6th Cir. 2022) .................................................................38

*Long v. Norris*,
  929 F.2d 1111 (6th Cir. 1991) ..............................................................20

*Machan v. Olney*,
  958 F.3d 1212 (6th Cir. 2020) ..............................................................18

*Malley v. Briggs*,
  475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)........................22

*Mitchell v. Forsyth*,
  472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)..................1, 19

*Moldowan v. City of Warren*,
  578 F.3d 351 (6th Cir. 2009) ................................................................18

*Moore v. City of Cincinnati*,
  No. C-1-08cv-05, 2009 WL 1079663 (S.D. Ohio, March 31, 2009) ................48

*Morrison v. Bd. of Trustees of Green Twp.*,
  583 F.3d. 394 (6th Cir. 2009) ...............................................................43

*Murray ex rel Morrow v. Metropolitan Government of Nashville*,
  No. 3:06-0570, 2007 WL1521004 (M.D. Tenn., May 21, 2007)......................42

*Mullenix v. Luna*,
  577 U.S. 7, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015)...........................21

*Myers v. City of Centerville*,
  41 F.4th 746 (6th Cir. 2022) ..........................................................17, 18

*Neague v. Cynkar*,
  258 F.3d 504 (6th Cir. 2001) ................................................................44

*Papasan v. Allain*,
  478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)........................25

*Pearson v. Callahan*,
    555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).......................17

*Puskas v Del. Cnty.*,
    56 F.4th 1088 (6th Cir. 2023) ...........................................................37

*Rondigo, L.L.C. v. Twp. of Richmond*,
    641 F.3d 673 (6th Cir. 2011) ......................................................16, 45

*Saucier v. Katz*,
    533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ...................20

*Smith v. City of Troy*,
    874 F.3d 938 (6th Cir. 2017) ...............................................11, 20, 40

*Sterling Hotels, LLC v. McKay*,
    71 F.4th 463 (2023) ................................................................15, 17

*United States v. Arvizu*,
    534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)....................27

*United States v. Hardnett*,
    804 F.2d 353 (6th Cir. 1986) ...........................................................33

*United States v. Heath*,
    259 F.3d 522 (6th Cir. 2001) ...........................................................41

*United States v. Perdue*,
    8 F.3d 1455 (10th Cir.1993) ............................................................33

*United States v. Saari*,
    272 F.3d 804 (6th Cir. 2001) ...........................................................26

*Valdez v. United States*,
    58 F.Supp.3d 795 (W.D. Mich. 2014) ........................................34, 44

*Vanderhoef v. Dixon*,
    938 F.3d 271 (6th Cir. 2019) ...........................................................38

*Vergili v. Gilbert*,
    272 F.3d 391 (6th Cir. 2001) ...........................................................20

*Weiner v. Klais & Co.*,
    108 F.3d 86 (6th Cir. 1997) .................................................................46

*Wershe v. City of Detroit, Michigan*,
    112 F.4th 357 (6th Cir. 2024) ...........................................................45

*White v. Pauly*,
    580 U.S. 73, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) .......................21

*Williams v. Maurer*,
    9 F.4th 416 (2021) ............................................................................21

*Wright v. City of Euclid, Ohio*,
    962 F.3d 852 (6th Cir. 2020) .......................................................37, 41

*Wyatt v. Blair*,
    Mich. Ct. of App., Dkt. 259750 (August 2, 2006)...........22, 23, 24, 36

*Wysocki v. Int'l Bus. Mach. Corp.*,
    607 F.3d 1102 (6th Cir. 2010) ...........................................................45

*Yeary v. Goodwill Industries-Knoxville, Inc.*,
    107 F.3d 443 (6th Cir. 1997) .............................................................46

## Statutes

28 U.S.C. §1291 ......................................................................................1

28 U.S.C. §1331 ......................................................................................1

42 U.S.C. §1983 ..................................................................................1, 10

## Other Authorities

6 Cir. R. 34 .........................................................................................x, 1

Fed. R. App. P. 34 ..................................................................................x

Fed. R. Civ. P. 12(b)(6)..........................................................................15

Fed. R. Evid. 803(8)................................................................................48

U.S. Const. amend. IV ...................................... 1, 2, 10, 14, 20, 25, 26, 27, 37, 38, 43

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

The Defendants-Appellants request oral argument in accordance with Fed. R. App. P. 34 and 6 Cir. R. 34 because this appeal involves important issues of law relating to the denial of qualified immunity to several police officers. The complexity of the issues of law would be clarified by oral argument.

Specifically, the District Court failed to evaluate each officer's actions individually, found that this case was one that so "obviously" violated the law that no specific precedential decision was necessary to show that the Constitutional violations alleged were clearly established, and disregarded evidence in the body-worn camera video and other public records that were properly before the District Court.

## STATEMENT OF JURISDICTION

Plaintiff-Appellee filed her Complaint in the District Court against the City of Grand Rapids, its former Police Chief, and three individual police officers (Sellner, Barberino, and Dionne) on November 22, 2023. (*Complaint,* RE 1, Page ID ## 1-32.) Plaintiff-Appellee's claims against the Defendant-Appellant Officers were brought pursuant to 42 U.S.C. §1983. Plaintiff alleged that the District Court had jurisdiction pursuant to 28 U.S.C. §1331. (*Complaint,* RE 1, Page ID #4 at ¶20.)

Only three of Plaintiff-Appellee's claims survive. Each is based on alleged violations of the Fourth Amendment. (*Opinion,* dated June 18, 2024, RE 30, PageID ##372-400.) The Defendant-Appellant Officers filed the Notice of Appeal on July 17, 2024. (*Notice,* RE 45, PageID ## 577-8.)

This Court has jurisdiction over the District Court's Order denying dismissal on the grounds of qualified immunity pursuant to 28 U.S.C. §1291. Denial of qualified immunity, to the extent that decision turned on an issue of law, is immediately appealable as a final judgment under the collateral order doctrine. 28 U.S.C. §1291; *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

1

## STATEMENT OF ISSUES PRESENTED

A.    For a plaintiff to avoid dismissal on the grounds that a police officer is entitled to qualified immunity, the plaintiff must allege facts to show that the officer violated a Constitutional right, and that the right was 'clearly established' at the time of the challenged conduct.  Here, the Officers were each denied qualified immunity at the pleadings stage.   By denying qualified immunity, the District Court erred by finding that:

1. The Plaintiff adequately alleged that Officers Sellner, Barberino, and Dionne violated Honestie Hodges's Constitutional rights as protected by the Fourth Amendment when she was "seized" and that the right allegedly violated was clearly established at the time; and

2. Plaintiff sufficiently alleged that Officer Dionne used excessive force by pointing a gun in Honestie's direction during the search for a potentially armed suspect, in violation of her clearly established Constitutional right not to be subjected to excessive force; and

3. Plaintiff had sufficiently alleged that Officer Barberino used excessive force when he handcuffed Honestie in violation of her clearly established Constitutional right not to be subjected to excessive force, even though Plaintiff did not contend that the handcuffing caused physical injury.

B.    In deciding a motion to dismiss, a court may consider not only the factual allegations contained in the complaint, but also any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein. Here, the District Court abused its discretion when it failed to consider the two public records, which were attached to the motion to dismiss and which were offered for the limited purpose of further showing why the Officers were dispatched to the Hodges's residence.

# I.     STATEMENT OF THE CASE

Defendants-Appellants, Spencer Sellner, Anthony Barberino, and Jeffrey Dionne (the "Officers"), filed this Appeal because that they were erroneously denied dismissal based on qualified immunity.  The core facts of this case are undisputed or are depicted by the body-worn camera video.  Each of these Officers is entitled to qualified immunity.

## A.     GRAND RAPIDS POLICE OFFICERS RESPONDED TO A STABBING AND WERE INFORMED THAT THE SUSPECT MAY HAVE FLED TO THE HODGES'S RESIDENCE.

On December 6, 2017, Grand Rapids Police Officers were dispatched to 1323 Hamilton Avenue, on a report that the caller had been stabbed and the suspect had fled on foot with the knife. [*Compl.,* RE 1, PageID #2 at ¶2 and PageID #9 at ¶78; *Bloom BWC,* RE14-6, PageID #133 at 16:10 ("somebody just got stabbed on Hamilton"); *Barberino BWC,* RE 14-2, PageID # 119 at 00:57-01:01 ("suspect did flee with the knife"); *CAD Report,* RE 14-1, PageID ##114-118.]

It was reported that the suspect could be fleeing to the Hodges's residence, 1509 Turner Ave. [*Bush BWC,* RE 14-4, PageID #131 at 09:49-10:15 ("investigating a crime, we have reason to believe the person is either at this house or coming to this house"); *Bloom BWC,* RE 14-6, PageID #133 at 12:21-12:25 ("had information that a stabbing suspect came here"); *CAD Report,* RE 14-1, PageID #115; *Incident Rpt.,* RE 14-3, PageID #125.]

Plaintiff alleged that "[i]t was determined that GRPD was looking for an adult Caucasian woman who had allegedly stabbed another individual at a different location" and that the "suspect, an adult Caucasian woman, was described as wearing her hair in a ponytail bun and wearing a black coat." (*Compl.*, RE 1, PageID #9 at ¶78-79; *CAD Rpt.,* RE 14-1, PageID #115; *Barberino BWC,* RE 14-2, PageID #119 at 00:30-00:37 "black coat, black hair in a bun.")

With information that the armed suspect may have fled to the Hodges's residence, the Officers arrived there.

## B.   OFFICERS ARRIVED AT THE HODGES'S RESIDENCE IN SEARCH OF A SUSPECT ARMED WITH A KNIFE.

Honestie Hodges was at home that evening. (*Compl.,* RE 1, PageID #2 at ¶¶1-2; *Incident Rpt.,* RE 14-3, PageID ##120-130.)   The Officers, who had been notified that the armed suspect might flee to the Hodges's address (*Bloom BWC,* RE 14-6, PageID #133 at 12:20-12:25; *CAD Report,* RE 14-1, PageID #115), began to plan how to find out if the armed suspect was inside. (*Barberino BWC,* RE 14-2, PageID #119 at 00:42-01:20; *Bush BWC,* RE 14-4, PageID #131 at 00:01-05:25; *Compl.,* RE 1, PageID ##78-9; *CAD Rpt.,* RE 14-1, PageID #115.)

Honestie was leaving her home to "go to the store" with "an adult family friend, Aisha Rose[1]." (*Compl.,* RE 1, PageID #2 at ¶1 and PageID #7 at ¶47.) Honestie and Aisha exited out of the back door, followed by Honestie's mother, Whitney. (*Compl.,* RE 1, PageID #7, at ¶¶47, 49, and 51; *Bloom BWC, Def. Br. Ex. F,* RE 14-6, PageID #133 at 9:05-9:30.) Whitney was standing immediately behind Honestie on the back porch. (*Compl.,* RE 1, PageID #7 at ¶51; *Bush BWC,* RE 14-4, PageID #131 at 6:55-7:35 and 9:51-10:49.)

Officers drew their weapons when Honestie, Aisha, and Whitney exited the house. (*Compl.,* RE 1, PageID #7 at ¶¶50-53; *Bloom BWC,* RE 14-6, PageID #133 at 09:12-09:30.) Officer Sellner asked for assistance in the backyard where Honestie, Aisha, and Whitney had come outside. (*Barberino BWC,* RE 14-2, PageID #119 at 1:12-1:18; *Bush BWC,* RE 14-4, PageID #131 at 3:32-3:50.) Sgt. Bush then sent Officer Barberino to the backyard. (*Bush BWC,* RE 14-4, PageID #131 at 4:19-4:45.)

Upon instruction, Aisha put her hands up and faced away from the Officers. (*Bloom BWC,* RE 14-6, PageID #133 at 09:18; *Barberino BWC,* RE 14-2, PageID #119 at 1:55.) Honestie was on the second step of the back porch, leading to the back door. (*Barberino BWC,* RE 14-2, PageID #119 at 1:55; *Bloom BWC,* RE 14-

---

[1] Aisha later revealed that she lived at the address of the stabbing and that she was the sister of both the suspect and the victim. *Bush BWC,* RE 14-4, PageID #131 at 16:10-16:25 ([Aisha] is the "actual tenant" of the Hamilton address, "she must've left just before the stabbing, just got here [to the Hodges's residence].)

6, PageID #133 at 09:23.)  Whitney stood behind Honestie. (*Compl.,* RE 1, PageID #7 at ¶51; *Barberino BWC*, RE 14-2, PageID #119 at 1:55 and 3:25; *Bush BWC*, RE 14-4, PageID #131 at 9:05, 10:12-10:20.)

Honestie followed Officer Sellner's commands directed to "black jacket" to "please step down off the steps" and to walk towards the officers backwards. (*Compl.,* RE 1, PageID #8 at ¶56; *Barberino BWC*, 14-2, PageID #119 at 3:31-3:52.) When she was within arm's length, Officer Sellner directed Honestie past him in the very confined space. (*Compl.,* RE 1, PageID #8 at ¶56; *Barberino BWC*, RE 14-2, PageID #119 at 3:31-3:52.) Honestie moved past Officer Sellner as Officer Barberino said to her "come back here" and "put your right hand behind your back." (*Compl.,* RE 1, PageID #8 at ¶60; *Barberino BWC*, RE 14-2, PageID #119 at 3:55.) Officer Barberino then handcuffed Honestie. (*Compl.,* RE 1, PageID #8 at ¶60; *Barberino BWC,* RE 14-2 at 3:57.) Officer Barberino handed Honestie off to Officer Dionne.  (*Compl.,* RE 1, PageID #9 at ¶70; *Barberino BWC*, RE 14-2, PageID #119 at 4:14.) Officer Barberino's interaction with Honestie Hodges lasted 19 seconds.  (*Barberino BWC*, RE 14-2, PageID #119 at 3:55-4:14.)

Officer Dionne took Honestie to a police cruiser, asking her to calm down and telling her that she was "not going to jail." (*Compl.,* RE 1, PageID #9 at ¶70-74; *Dionne BWC,* RE 14-5, PageID #132 at 2:28-2:59.) Officer Dionne patted Honestie down for weapons. (*Compl.,* RE 1, PageID #9 at ¶71.) He also asked her

7

if she knew of someone named "Manning" and Honestie replied that she did not. (*Compl.,* RE 1, PageID #9 at ¶74; *Dionne BWC,* RE 14-5, PageID #132 at 3:07-3:18.) Officer Dionne opened the door to the cruiser and told her to take a seat to stay warm and said Honestie would be out of the handcuffs "in no time." (*Compl.,* RE 1, PageID #9 at ¶¶71-76; *Dionne BWC,* RE 14-5, PageID #132 at 3:18-4:01.)

Shortly thereafter, Sgt. Bush directed Officer Dionne to remove the handcuffs, which he promptly did. (*Compl.,* RE 1, PageID #9 at ¶¶75-76; *Bush BWC*, RE 14-4, PageID #131 at 9:09-9:30; *Dionne BWC*, RE 14-5, PageID #132 at 4:08-4:40.)   In total, Honestie was handcuffed for 2 minutes and 39 seconds. (*Dionne BWC*, RE 14-5, PageID #132 at 2:28-4:40; *Barberino BWC*, RE 14-2, PageID #119 at 3:57-4:14.)

## C.   THE OFFICERS WORKED TO DILIGENTLY CONCLUDE THEIR INVESTIGATION AT THE HODGES'S ADDRESS.

In addition to Honestie, Aisha and Whitney were handcuffed. (*Compl.*, RE 1, PageID.8 at ¶¶65-66.) Once Whitney was secured, Sgt. Bush conferred with Sgt. Dailey, who noted that Whitney was "close" as a match to the description of the stabbing suspect. (*Bush BWC*, RE 14-4, PageID #131 at 12:30-12:45.) They also noted that Whitney could have taken off the sweatshirt and boots (which was part of the original description of the suspect) and that she had a fresh scratch above her eye. (*Bush BWC*, RE 14-4, PageID #131 at 12:30-12:51.)

The officers then worked to: (1) confirm the identities of the adult women, Aisha and Whitney; and (2) devise a plan to safely remove the remaining individuals from the house – whom Whitney had identified as an adult male, Kamau Rosa, along with her four other children. (*Bush BWC*, RE 14-4, PageID #131 at 12:00-12:15; *Incident Report*, RE 14-3, PageID #120-130.) Ultimately, the remaining adult and children exited the home and were brought out to the alley. (*Bush BWC*, RE 14-4, PageID #131 at 16:41-21:48; *Barberino BWC,* RE 14-2, PageID #119 at 13:28-16:31.) Honestie was released from the cruiser to join them. (*Bush BWC,* RE 14-4, PageID #131 at 21:58-22:23.)

Once officers confirmed Whitney's identity and that she was not the stabbing suspect, Officer Sellner released her to be with her children. (*Compl.,* RE 1, PageID #10 at ¶84; *Bush BWC,* RE 14-4, PageID #131 at 21:58-22:23.) With Whitney's consent, the Officers searched the residence. The suspect was not found there, and the Hodges family returned to the house where Sgt. Bush spoke with Whitney to ensure that she understood the situation. (*Compl.*, RE 1, PageID #10 at ¶84; *Bush BWC*, RE 14-4, PageID #131 at 33:10-34:08.) The entire interaction between the Hodges family and the police lasted about 30 minutes. (*See, generally, Bush BWC*, RE 14-4, PageID #131 at 3:32-34:08.)

On November 22, 2020, nearly three years later, Honestie Hodges died of complications from COVID-19 at the age of 14. (*Compl.,* RE 1, PageID #3 at ¶12.)

**D.   PROCEDURAL POSTURE: THE DISTRICT COURT FOUND THAT THE OFFICERS WERE NOT ENTITLED TO DISMISSAL BASED ON QUALIFIED IMMUNITY.**

Whitney Hodges, Honestie's mother and her personal representative, sued the City of Grand Rapids, the (now-retired) Police Chief David Rahinsky[2], and Officers Sellner, Barberino, and Dionne. (*Compl.,* RE 1, PageID ##1-32.) Whitney alleged that Honestie's civil rights were violated when the Officers detained and handcuffed Honestie in violation of her rights secured by the Fourth Amendment of the U.S. Constitution.  (*Compl.,* RE 1, PageID ##1-32.)

The Defendants obtained dismissal of all of Plaintiff's claims except for Counts I-III, which were alleged against Officers Sellner, Barberino, and Dionne, in their individual capacities, based on 42 U.S.C. §1983 for violation of the Fourth Amendment. (*Opinion,* RE 30, PageID ##372-400; *Order*, RE 31, PageID #401.) Specifically, the District Court determined that these Officers were not entitled to qualified immunity at this stage of the case. (*Opinion,* RE 30, PageID ##376-388.)

Officers Sellner, Barberino, and Dionne now bring this appeal asking this Court to find that each of them is entitled to qualified immunity and the case against them be dismissed.

---

[2] Rahinsky was dismissed by Stipulation.  (*Order Granting Stipulation,* RE 12, PageID #64.)  Plaintiff's claims against the City were dismissed by the Court. (*Order,* RE 31, PageID #401.)

10

## II.    <u>SUMMARY OF THE ARGUMENT</u>

The District Court erroneously denied Officers Sellner, Barberino, and Dionne qualified immunity.

First, the District Court did not analyze each individual Officer's actions. "When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately. [And] the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (citation omitted). While the District Court segmented its analysis of qualified immunity, generally, into two segments (wrongful seizure and excessive force),[3] the Court did not consider each Officers' actions nor did it appear to take into account that the three claims are not all alleged against each Officer. (*See, Compl.,* RE 1, PageID ## 1-33, alleging Count I against Sellner, Barberino, and Dionne; Count II against Barberino and Dionne; and Count III against Sellner and Barberino.)

Next, the District Court erred when it summarily concluded that no specific existing precedent was required to place each Officer on notice that his individual conduct was wrong. The denial of qualified immunity for these claims was predicated upon the District Court's conclusion that "any reasonable officer in

_____

[3] The "seizure" claims are Counts I and II, while the "excessive force" claim is Count III. (*Compl.,* RE 1, PageID ## 1-33.)

Defendants' respective positions would have known that they could not detain Honestie (through firearms, handcuffs, or otherwise) simply because they were looking for an adult suspect involved in a stabbing incident that occurred at another location somewhere else in the city." (*Opinion,* RE 30, PageID #383.) Importantly, neither the Court nor the Plaintiff pointed to any clearly established legal precedent which would have put any of these Officers on notice that the action each took, individually, was in violation of clearly established law.   Instead, the Court summarily found that the Officers' actions were so obviously unlawful that no specific clearly established precedential decision was required.  [*Opinion,* RE 30, PageID #388, "…even in the absence of identifiable precedent addressing similar circumstances, this is an 'obvious case'…where the unlawfulness of [the] conduct is sufficiently clear." (citations omitted).]  But this is not such an "obvious" case, and neither the Court nor the Plaintiff identified precedent that existed on December 6, 2017, which would render any of the Officer's conduct so clearly unlawful as to deny them qualified immunity.

Finally, the District Court erred by concluding that there was no reason for Officers to be present at Plaintiff's residence, when, in fact, they were there on information that a suspect in a stabbing, who was armed with a knife, may have fled to Plaintiff's address.  To reach the conclusion that there was no reason for the Officers to be at the Hodges's residence to begin with, the District Court

ignored statements made by the Officers and others on the BWC videos. The Court also disregarded information contained in the two public records, which were attached to the Defendants' Motion (the CAD Report and the Incident Report), which further clarified the Officers' reason for being there and merely filled in the contours of the Complaint.

In its Opinion, the District Court noted that Defendants claimed "that they were looking for a stabbing suspect whom they were told might be located at Honestie's address[,]" (*Opinion., RE 30, PageID ##381-382) but went on to state that:

> [n]othing in the complaint, however, provides the reason for why Defendants were at or near Plaintiff's home when Honestie walked out her back door. To the contrary, Plaintiff alleges that Defendants were purportedly looking for a suspect who had stabbed another individual at a different location. (Compl ¶ 78.) Plaintiff also alleges that incident was "unrelated to Honestie or any of the occupants of [her] house." (Id. ¶ 2.)

(*Opinion,* RE 30, PageID #382) (citations to the Complaint in original). This conclusion misrepresents the allegations pled in this case, when taken as a whole and subject to contradictory video evidence. The Complaint itself alleges that the Officers were looking for the suspect in a stabbing (*Compl., RE 1, PageID #9 at ¶78.) The video evidence contradicts Plaintiff's allegation and the District Court's conclusion that the incident was wholly "unrelated to…any of the occupants" of the residence and that the Officers had no reason to be at the Hodges's house.

(*Compl.* RE 1, PageID #1 at ¶2; *Opinion,* RE 30, PageID #382.)  The video shows that the Officers were acting on information that a suspect, armed with a knife, was fleeing *to the Hodges's address*. Moreover, Honestie's "adult family friend," Aisha Rosa, was a resident of the location where the stabbing had occurred, had recently arrived at the Hodges's residence, and was related to both the stabbing suspect and the victim.  [*Bush BWC,* RE 14-4, PageID #131 at 16:10-16:25; *Bloom BWC,* RE 14-6, PageID #133 at 16:06, 16:18, and 16:35.]  The District Court also ignored that the description of the suspect (adult Caucasian female with black hair in a ponytail bun), and Whitney Hodges, who can be seen standing on the back porch immediately behind Honestie, are distinctly similar. Plaintiff has never disputed this, instead only contending that Honestie looked nothing like the suspect.  (*Pl. Resp. Br.,* RE 19, PageID #295.)

The Officers, under the totality of circumstances they faced, were acting as any reasonable officer would have, and did not violate any right of Honestie Hodges which was clearly established at the time.  The District Court erred as a matter of law by denying these Officers dismissal at this stage based on qualified immunity.  The additional documents that the Court incorrectly failed to consider merely underscore the error of the Court's decision.  Based on the pleadings, when the video evidence is considered, the Officers' actions cannot be found to have clearly violated Honestie's Fourth Amendment Rights.

14

### III.  <u>ARGUMENT</u>

**A.  STANDARD OF REVIEW:  A DISTRICT COURT'S DENIAL OF QUALIFIED IMMUNITY AT THE MOTION TO DISMISS STAGE IS REVIEWED BY THIS COURT DE NOVO.**

When a district court denies the defense of qualified immunity "at the pleading stage, posing a question of law" the Court of Appeals reviews that decision de novo. *Johnson v. Mosely,* 790 F.3d 649, 652 (6th Cir. 2015), quoting *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011); *Sterling Hotels, LLC v. McKay,* 71 F.4th 463, 466 (2023) ("We review the district court's denial of qualified immunity de novo.")

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint "for failure to state a claim upon which relief can be granted." The factual allegations contained in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the claim plausible, i.e. more than merely possible." *Fritz v. Charter Tp. of Comstock,* 592 F.3d 718, 722 (6th Cir. 2010), citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009).

"[A] legal conclusion couched as a factual allegation need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." *Fritz,* 592 F.3d at 722 (quotations omitted); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  "Where a

complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."' *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (quoting *Twombly,* 550 U.S. at 557) (add'l citations omitted).

In deciding whether to grant a motion to dismiss, "the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case also may be taken into account." *Amini v. Oberlin College,* 259 F.3d 493, 502 (6th Cir. 2001) (citations omitted), and *see Rondigo, supra.* "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Amini,* 259 F.3d at 502, citing *Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir. 1997).

Additionally, because "[q]ualified immunity isn't just a defense to liability – it's immunity from the costs and burdens of a suit in the first place," in qualified immunity cases video can be considered at the motion to dismiss stage. *Bell v. City of Southfield,* 37 F.4th 362, 364 (6th Cir. 2022). "So when uncontroverted video evidence easily resolves a case, [the Court] honor[s] qualified immunity's principles by considering the videos." *Id.* It does not make sense to "waste time and effort by ignoring the video contents." *Id.*

16

**B.    OFFICERS SELLNER, BARBERINO, AND DIONNE WERE EACH ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW.**

    **1.    Qualified Immunity Requires a Plaintiff to Plead Facts that a Constitutional Right was Violated and that the Right was Clearly Established at the Time.**

The doctrine of qualified immunity shields governmental officials from liability for civil damages, litigation, and discovery, if their actions do not violate any clearly established statutory or constitutional right of which a reasonable person would have been aware. *Myers v. City of Centerville*, 41 F.4th 746, 758 (6th Cir. 2022); s*ee also*, *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (finding that "[b]ecause qualified immunity is 'an immunity from suit rather than a mere defense to liability … it is effectively lost if a case is erroneously permitted to go to trial.") "[T]he driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." *Sterling Hotels, LLC v. McKay,* 71 F.4th 463, 466 (2023) (internal citations omitted). "At the pleadings stage…the court takes the complaint's factual allegations as true and decides whether – based on those facts – the defendant is entitled to qualified immunity." *Sterling Hotels, supra,* citing *Courtright v. City of Battle Creek,* 839 F.3d 513, 518 (6th Cir. 2016).   While the court must view the facts in the light most favorable to the plaintiff, the court may not rely on allegations that are clearly contradicted by

video capturing the events in question. *Machan v. Olney,* 958 F.3d 1212, 1213 (6th Cir. 2020) (citations omitted).

An individual defendant is entitled to qualified immunity at the pleadings stage unless "(1) the facts alleged make out a violation of a constitutional right' and (2) that right 'was clearly established when the event occurred so that a reasonable official would have known that his conduct violated it.'" *Myers,* 41 F.4th at 757, quoting *Crawford v. Tilley*, 15 F.4th 752, 762-63 (6th Cir. 2021); *see also, Ashcroft v. al-Kidd,* 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (citation omitted). The Court is free to consider the two prongs of qualified immunity in whatever order is appropriate in light of the issues before it. *Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009) (*see also, Ashcroft v. al-Kidd,* 563 U.S. at 735, citing *Pearson v. Callahan*, 555 U.S. at 236, stating that the "courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first.")

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgements about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft*, 563 U.S. at 743, quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Thus, "qualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is

unlawful.'"  *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), quoting *Saucier v. Katz,* 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

When a defendant asserts qualified immunity, the plaintiff bears the burden to show that a defendant is not entitled to such protection. *Johnson v. Mosely,* 790 F.3d at 653; *Guertin v. State of Michigan,* 912 F.3d 907, 917 (6th Cir. 2019).  The plaintiff is "obliged to plead facts that, viewed in the light most favorable to him, make out a violation of a constitutional right so clearly established in a particularized sense that a reasonable officer confronted with the same situation would have known that his conduct violated that right."  *Johnson v. Mosely,* 790 F.3d at 653.  A "plaintiff, having sued defendant officers for violation of his civil rights, to overcome their assertion of qualified immunity, [is] obliged to allege facts describing how each defendant's conduct violated a federally protected right under clearly established law." *Id.* at 656. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

"When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately. [And] the court must segment the incident into its constituent parts and consider the officer's entitlement

to qualified immunity at each step along the way." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (citation omitted).

### 2.    A Right is Clearly Established When Every Reasonable Officer Would Have Known that His Actions Violated a Protected Right.

A constitutional right is "clearly established," thereby precluding the application of qualified immunity, if "the law [is] clear in regard to the official's *particular actions* in the *particular situation.*" *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991) (emphasis added), abrogated on other grounds as recognized in *Vergili v. Gilbert*, 272 F.3d 391, 395 (6th Cir. 2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*., quoting *Anderson v. Creighton*, 438 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Stated another way, it must be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. at 202.  That, in turn, means that, "in light of pre-existing law[,] the unlawfulness [of the officer's conduct] must be apparent." *Hope v. Pelzer*, 536 U.S. at 739, quoting *Anderson*, 483 U.S. at 640.

"The plaintiff has the burden of demonstrating that the law was clearly established at the time of the challenged conduct.*" Andrews v. Hickman Cnty., Tenn.,* 700 F.3d 845, 853 (6th Cir. 2012)*,* referencing *Hughes v. City of North Olmsted,* 93 F.3d 238, 241 (6th Cir.1996).  Cases such as *Graham v. Connor,* which discuss the requirements of the Fourth Amendment, are "cast at a high level

of generality" and are typically insufficient to provide the fair warning required to clearly establish the illegality of an action. *Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S.Ct. 569, 160 L.Ed.2d 583 (2004). Instead, "Plaintiffs must generally identify a case with a fact pattern similar enough to have given 'fair and clear warning to officers' about what the law requires." *Guertin*, 912 F.3d at 932, quoting *White v. Pauly*, 580 U.S. 73, 79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017). While such a case need not be "on all fours in order to form the basis for the clearly established right[,]" *Guertin*, 912 F.3d at 932 (citation omitted), there must still be "controlling authority or a robust consensus of persuasive authority." *Id.,* quoting *Plumhoff v. Rickard*, 572 U.S. 765, 780, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) (internal quotation marks omitted). "Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly,* 580 U.S. at 79 (citations omitted).

In fact, to be "clearly established," a right must be "sufficiently clear that *every* reasonable official would have understood what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (per curiam), quoting *Reichle v. Howards,* 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (emphasis added); and *see*, *Williams v. Maurer,* 9 F.4th 416, 437 (2021)( "…at the time of the challenged conduct, the contours of a right [must

be] sufficiently clear that every reasonable official would have understood that what he is doing violates that right.")  "If officers of reasonable competence could disagree on the existence of a right, immunity should be recognized." *Jarvis v. Wellman,* 52 F.3d 125, 126 (1995) (citations omitted); and *see, Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Here, the District Court failed to follow the required legal analysis. It did not assess whether the Plaintiff met her burden to demonstrate that "in light of pre-existing law[,] the unlawfulness [of each individual officer's conduct was]…apparent." *Hope*, 536 U.S. at 739. As a result, the Court incorrectly concluded that the Officers were not entitled to qualified immunity at this stage of the proceedings.

### 3.    Then-Existing Case Law Favored the Lawfulness of the Officers' Actions.

Given the proper analysis, however, qualified immunity *was* warranted as Plaintiff-Appellee did not plead and cannot "show that 'then-existing precedent' put the illegality of [the Officers'] conduct 'beyond debate.'" *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020), quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018).  In fact, pre-existing Michigan law supported the *lawfulness* of the Officers' conduct under remarkably similar circumstances. *Wyatt v. Blair*, Mich. Ct. of App., Dkt. 259750 (August 2, 2006) 2006 WL 2135761.  (RE 14- 8, PageID ##199-204.)

In *Wyatt*, the Michigan Court of Appeals held that law enforcement officers who detained, handcuffed, and placed in a patrol car a minor while they were conducting an investigatory search for suspects, were protected by state-law governmental immunity. *Wyatt,* 2006 WL 2135761 at *1 and *3. (RE 14-8, PageID #199 and #201.) There, officers were searching for suspects who were reportedly involved in an armed robbery and who had taken flight into a residential neighborhood. *Id.*, at *1. During the pursuit, officers received information that a "suspicious individual" was spotted nearby and a "canine tracked a scent to the rear of plaintiff's home." *Id*. "With assault rifles trained at the home, the officers then ordered the occupants of the house to exit…." *Id*. After exiting, two children (one 16 and the other 11 years old), neither of whom fit the description of the suspects, were placed in handcuffs, taken to the front of the house, and placed in a patrol car until officers could confirm that none of the home's occupants were involved in the armed robbery. *Id.*

The Michigan Court of Appeals found that, even when viewed in the light most favorable to the plaintiffs, the circumstances could not support a conclusion that the officers acted in anything but an objectively reasonable manner. *Id.* at *4. In particular, the Court agreed that there was "no room" for doubt that the safety of the police officers *and the plaintiffs*, required the officers to move quickly to remove the minors to a safe location while the officers determined if anyone in the

home was the suspect they were looking for. *Id.* at *3. Thus, the officers were each entitled to dismissal of the state-law intentional tort claims (including claims for assault and battery and false imprisonment/false arrest) based on governmental immunity.

The similarities between the case here and the *Wyatt* decision are striking, and notably, neither the Plaintiff nor the District Court mentioned (let alone distinguished) the case. (*Pl. Resp. Br.*, RE 19, PageID ##246-299; *Opinion*, RE 30, PageID ##372-400.) As in this case, the armed suspects in *Wyatt* were thought to have fled to plaintiff's home or the nearby area. *Wyatt,* at *1. As in this case, the officers in *Wyatt* had weapons trained on the home. *Id.* As in this case, neither of the minors in *Wyatt* fit the description of the suspects but were handcuffed and placed in a patrol car until the officers could confirm that no one in the home was involved in the armed robbery. *Id.*

While the Defendants-Appellants concede that this Court is not bound by Michigan case law, the Court should find the *Wyatt* decision persuasive given its similarities to the facts here and the paucity of federal law on these particular circumstances. *See e.g., Burn v. Lafler,* 328 F. Supp. 2d 711, 721 n.3 (E.D. Mich. 2004) (citation omitted). More importantly, *Wyatt* constitutes pre-existing case-law that stands for the proposition that the Officers here acted lawfully with respect to Honestie. At the very least, *Wyatt* undercuts any claim that the "unlawfulness"

24

of their conduct was "apparent" or "beyond debate." *Hope,* 536 U.S. at 739;

*Ashford,* 951 F. 3d at 801 (6th Cir. 2020).

Beyond *Wyatt,* Plaintiff's specific factual allegations, when accepted as true,

and viewed along with the video evidence and applicable law, support the Officers'

entitlement to qualified immunity at this juncture.

### 4. Officers Sellner, Barberino, and Dionne are Each Entitled to Qualified Immunity and Dismissal of the Seizure Claims[4].

Plaintiff alleged that the Officers detained Honestie at gunpoint, handcuffed

her, put her into a police cruiser, and that they did so without probable cause or

reasonable suspicion, thereby wrongfully seizing her in violation of the Fourth

Amendment. (*Compl.,* RE 1, PageID #14 at ¶114.) While the District Court was

obligated to accept Plaintiff's well-pleaded factual allegations as true, this did not

apply to Plaintiff's claims that the Officers acted "without probable cause or

reasonable suspicion," (*Compl.,* RE 1, PageID #114 at ¶114) as those are mere

legal conclusions masquerading as facts. *Papasan v. Allain*, 478 U.S. 265, 286, 106

S.Ct. 2932, 92 L.Ed.2d 209 (1986); and *see, Bell Atlantic Corp. v. Twombly*, 550

U.S. at 555, holding that the court need not accept as true "a legal conclusion

couched as a factual allegation." The District Court erroneously adopted Plaintiff's

---

[4] The District Court addressed the claims as the "wrongful seizure" and the "excessive force" claims. (*Opinion,* RE 30, PageID ## 381-388.) Following this analysis, the Officers will so address Plaintiff's claims but will also address the claims as they relate to each Officer as the District Court should have done.

legal conclusions as factual truth without any relevant discussion of the law governing probable cause or reasonable suspicion. (*Opinion,* RE 30, PageID #381.) Considering the applicable law, Plaintiff's allegations are not sufficient to avoid qualified immunity.

The Officers acknowledge that even a brief and limited investigatory detention, such as occurred here, is is "a seizure that is subject to Fourth Amendment scrutiny." *United States v. Saari,* 272 F.3d 804, 809 (6th Cir. 2001). However, "[i]t must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). In this regard, "police only need a reasonable suspicion of criminal activity to conduct a brief investigatory detention." *Gardenshire v. Schubert,* 205 F.3d 303, 313 (6th Cir. 2000). "'Reasonable suspicion exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting … criminal activity.'" *Bey v. Falk*, 946 F.3d 304, 313 (6th Cir. 2019), quoting *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011). As the Court in *Bey* said:

> This standard requires more than a mere hunch, but at the same time is satisfied by a likelihood of criminal activity less than probable cause and far less than a preponderance of the evidence.  In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them

taken together give rise to reasonable suspicion that criminal activity may be afoot.

*Bey,* 946 F.3d at 313 (internal quotations and citations omitted).  The "Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'"  *U.S. v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citations omitted).

Here, the factual allegations (distinct from the legal conclusions) together with the body-worn camera video, show that, under the totality of the circumstances, the Officers had a particularized and objective basis for suspecting that criminal activity might be "afoot" at the point they detained Honestie and her two companions, Aisha and Whitney.

Before Honestie, Aisha, and Whitney appeared on the back steps of the Hodges's residence, the Officers were investigating a stabbing and pursuing a suspect. (*Compl.*, RE 1, PageID #9, at ¶78.) The stabbing suspect was described as an adult Caucasian woman wearing her hair in a ponytail bun and wearing a black coat. (*Compl.*, RE 1, PageID #9, at ¶79.) The stabbing took place at another location. (*Compl.*, RE. 1, PageID #9, at ¶78). However, as Plaintiff acknowledged, "[t]he Grand Rapids Police Department ("GRPD") allegedly descended on Honesties' [sic] home in response to a call regarding a domestic violence incident unrelated to Honestie or any of the occupants of the house." (*Compl.*, RE 1,

PageID #2 at ¶2.)[5] Plaintiff later stated in her Complaint the "incident" was the stabbing. (*Compl.*, RE 1, PageID #9 at ¶78.)

Contrary to the District Court's conclusion that there was no reason to suspect that anyone at the home could be involved in criminal activity (*Opinion,* RE 30, PageID #388), the Officers had reason to be there.  The Officers went to the Hodges's home specifically in connection with the investigation of this violent offense. (*Bush BWC,* RE 14-4, PageID #131 at 09:49-10:15; *Bloom BWC,* RE 14-6, PageID #133 at 12:21-12:25.) In addition to the allegations in the Complaint and the video evidence, the CAD Report and the Incident Report (each of which are public records) clarified the reason for the Officers' presence at the Hodges's residence: the Hodges's residence had been specifically identified as an address to which the suspect – armed with a knife – might flee.  (*CAD Report,* RE 14-1,

---

[5] The District Court erroneously ignored the video evidence when it not only accepted as true Plaintiff's legal conclusions that there was no probable cause or reasonable suspicion of criminal activity, but also when the District Court concluded that the Officers had no reason "to suspect that [Honestie] or anyone else in her home was involved in criminal activity." (*Opinion,* RE 30, PageID #381.) To the contrary, police had information that the suspect might flee to the Hodges's residence. (*Bush BWC,* RE 14-4, PageID #131 at 09:49-10:15; *Bloom BWC,* RE 14-6, PageID #133 at 12:21-12:25.)  And, as it turned out, Aisha Rosa, who exited the residence with Honestie, was the tenant of the location where the stabbing took place.  She told officers that she had only just arrived at the Hodges's residence, and the victim as well as the suspect, were related to her. (*Bush BWC,* RE14-4, PageID #131 at 16:10-16:25; *Bloom BWC,* RE 14-6, PageID #133 at 16:06, 16;18, and 16:35.) Aisha later confessed that the suspect (Terry Manning) was her sister and wanted to know who Terry stabbed at Aisha's house. (*Bloom BWC,* RE 14-6, PageID #133 at 19:49-19:57.)

PageID ##114-118; *Incident Rpt.,* RE 14-3, PageID ##120-130.) The District Court erroneously ignored key portions of the video as well as these documents, even though they specifically illuminated why the Officers "descended on Honestie's home," as Plaintiff alleged. The reason that the Officers were at the Hodges's residence is not, and has not been, disputed.[6] (*Compl.,* RE 1, PageID #2 at ¶2.) Nonetheless, the District Court, selectively chose which facts to rely on from the video evidence while ignoring the *totality* of the circumstances.

The video also shows that the Officers were concerned for safety. Sgt. Bush, who was directing the perimeter around the Hodges's house, cautioned others to be "watching on our backside here because [the suspect's] on foot." (*Bush BWC*, RE 14-4, PageID #131, at 3:32-3:36.) Officers were also advised over the radio that the suspect had fled the scene of the stabbing with the knife. (*Barberino BWC,* RE 14-2, PageID #119 at 0:53-1:01.) So, before the Officers encountered Honestie, Aisha, or Whitney that night, the information they had been provided was that:

- A stabbing had occurred;

- The suspect was an adult Caucasian female wearing her dark hair in a ponytail bun;

- The suspect was still armed with the knife;

- She had fled crime scene on foot; and

---

[6] Plaintiff has never denied that the Officers were dispatched to her home specifically on reports that the suspect may have fled there.

- The Hodges's home was identified as a location to which the suspect might flee.

With only that information, the Officers arrived at the Hodges's residence.

While the Officers were working out how to approach the residence to search for the stabbing suspect (*Bush BWC,* RE 14-4, PageID #131 at 00:01-05:25), Honestie, Aisha, and Whitney exited the back door. (*Compl.,* RE 1, PageID #2 at ¶7; *Barberino BWC,* RE 14-2, PageID #119 at 00:42-01:20; *Bloom BWC,* RE 14-6, PageID #133 at 9:05-9:30.) The backyard was closed in by a chain link fence that was covered in branches. (*Dionne BWC*, RE 14-5, PageID #132 at 1:34-2:05.) The house had an unattached garage behind it with a dirt driveway next to the garage leading to an alleyway. (*Bush BWC*, RE 14-4, PageID #131 at 7:00-7:35.) There were two vehicles parked in the driveway. (*Bush BWC,* RE 14-4, PageID #131 at 7:00-7:15.) As a result, there was very little space between a parked minivan and the garage for the Officers to maneuver in or extract anyone from the house should that become necessary. (*Bush BWC,* RE 14-4, PageID #131 at 7:00-7:15.)  Further, it was nighttime and the only light in the backyard came from the alleyway. (*Bloom BWC*, RE. 14-6, PageID #133 at 7:41, 8:25.)

Honestie, Aisha, and Whitney emerged onto the porch steps. (*Bloom BWC*, RE 14-6, PageID #133 at 9:05-9:30; *Compl.* RE 1, PageID #7 at ¶47.) Officers turned on their flashlights. (*Bloom BWC*, RE 14-6, PageID #133 at 9:12.) Aisha stood closest to the Officers, Honestie stood behind Aisha on the step, and Whitney

came out behind Honestie. (*Bush BWC*, RE 14-4, PageID #131 at 6:55-7:35; *Compl.*, RE 1, PageID #7 at ¶¶47, 49, 51.) In the dim light, Whitney Hodges appeared to be an adult Caucasian female with her hair in a ponytail bun, consistent with the description of the stabbing suspect. (*Sellner BWC*, RE. 14-7, PageID #134 at 0:00-0:35.)

Whitney's similarity to the description of the stabbing suspect led to the need for split-second decisions by the Officers.  If she was the stabbing suspect, she was already reported to be violent. She also might still have the knife on her person. She therefore presented a potential immediate risk to the officers. Further, she also could present a risk to the two females (Honestie and Aisha) who were within her reach. The two could be hostages; they could merely be bystanders; or they might even be accomplices in some fashion, such as aiding the suspect in her escape or concealing the knife for her. Moreover, if Whitney was not the suspect, then the alternate risk existed that the actual suspect, armed and on foot, could interject herself into this situation from any direction.  Officers had no way of knowing the actual state of affairs in that moment.

Under the rapidly evolving circumstances unfolding in this confined area, the Officers' first task had to be to secure Honestie, Aisha, and Whitney in order to investigate the situation safely both for the Officers' protection and that of

31

Honestie, Aisha, and Whitney. In this regard, their actions were reasonable, both collectively and individually.

### a. Officer Sellner.

Plaintiff has alleged that Officer Sellner wrongfully seized Honestie Hodges by pointing his weapon at her. (*Compl.,* RE 1, PageID ##7, 14 at ¶¶52 and 114.) Officer Sellner drew his weapon when Honestie, Aisha, and Whitney appeared on the back porch of the Hodges's residence. (*Compl.,* RE 1, PageID #7 at ¶¶47-52; *Bloom BWC,* RE 14-6, PageID #133 at 9:14.) Given that Officer Sellner (along with the other Officers) were investigating a stabbing and looking for a potentially armed adult, Caucasian woman with her hair in a "ponytail bun," and he was suddenly confronted with Whitney, who matched that general description, as well as Honestie and Aisha, whom he did not know and whose motives were also unknown, his reaction was reasonable at the outset. Further, Officer Sellner kept his weapon pointed at the back porch and did so only long enough to have each individual separately secured. (*Barberino BWC,* RE 14-2, PageID #119 at 3:31-3:58.) Once Honestie was handcuffed, Officer Sellner was no longer pointing his weapon in her direction, as his attention remained on Whitney, who remained on the back porch. (*Barberino BWC,* RE 14-2, PageID #119 at 4:19-4:21.)

The law pertaining to Officer Sellner's actions supports granting qualified immunity. Detaining an individual by displaying a firearm is permissible in an

investigatory detention when the officer making the seizure acted out of a justifiable fear for safety. *Ingram v. City of Columbus,* 185 F.3d 579, 592 (6th Cir. 1999), referencing *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986) (holding that where "the display or use of arms is viewed as 'reasonably necessary for the protection of the officers,' the courts have generally upheld investigative stops made at gunpoint.")[7] Further, the fact that a minor was involved does not render the detention "unreasonable per se." *Gordon v. Louisville/Jefferson Cnty. Metro Gov*'t, 486 F.App'x 534, 542 (6th Cir. 2012).

Given Whitney's appearance behind the two other females, her physical similarity to the stabbing suspect, the potential that she might be armed, and the rapidly evolving set of circumstances presented, Officer Sellner acted reasonably and was not in violation of any clearly established precedent. The District Court's decision not to grant dismissal to Officer Sellner should be overturned, and he should be dismissed from this suit based on qualified immunity.

**b. Officer Barberino.**

Plaintiff's factual allegations against Officer Barberino are that he "handcuffed and detained" Honestie, coupled with the legal conclusions that

---

[7] See also, *United States v. Perdue*, 8 F.3d 1455, 1462–63 & n. 5 (10th Cir.1993) (holding that effectuating an investigative detention by pointing guns at an individual was reasonable where the officers had reason to fear for their safety and noting officers need not be absolutely certain the individual is armed because the issue is whether reasonably prudent persons in the circumstances would be warranted in the belief that their safety is at risk).

Barberino did so for "no legitimate reason," and was acting "unreasonably." (*Compl.*, RE 1, PageID #15 at ¶¶118-128.) However, Officer Barberino acted reasonably under the circumstances. The need to secure all three arose directly from the need to determine if Whitney was the armed suspect that the Officers were looking for and what role, if any, the other two were playing.

Again, the law applicable to Officer Barberino's actions supports granting him qualified immunity. As stated in *Valdez v. United States*, 58 F.Supp.3d 795, 817 (W.D. Mich. 2014):

> [A]n investigative detention does not become unreasonable just because officers handcuff an individual. Officers are authorized to handcuff individuals during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or maintain the status quo. However, the use of handcuffs is greater than a de minimus intrusion and thus requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Valdez, supra* (internal quotations and citations omitted).

Here, the facts available to Officer Barberino would warrant an officer of reasonable caution to believe that handcuffing each of three females, including Honestie, was appropriate. Officer Barberino needed to protect the safety of the Officers on the scene. The circumstances that he faced included not knowing if one of the individuals was armed with a butcher's knife that had just been used in a stabbing. While Honestie did not match the description of the suspect, the woman

34

directly behind her (Whitney) did and it could not be ruled out in the chaos of the moment that Whitney might have passed the knife to Honestie. Nor could Officer Barberino know if Honestie was acting of her own free will or under coercion. In fact, at that point, none of the Officers could have known what the relationship between them was.

Thus, Officer Barberino's decision to handcuff Honestie, to move her through the dark, narrow passage between the garage and the minivan, was reasonable given the risk that the situation might present. Consequently, Officer Barberino's actions did not violate any clearly established legal precedent. The District Court's decision to deny him qualified immunity should be overturned as he is entitled to dismissal based on qualified immunity grounds.

### c. Officer Dionne.

Officer Dionne's actions included escorting Honestie from Officer Barberino to one of the police cruisers located in the alleyway, behind the garage, and away from the house and the on-going scene. (*Compl.*, RE 1, PageID #9 at ¶¶70-71.) Once he made sure that Honestie did not have a weapon on her – including the knife that the officers were looking for – he secured her in the vehicle to stay warm and to maintain the status quo. (*Dionne BWC*, RE 14-5, PageID #132 at 3:07-4:47; *Compl.*, RE 1, PageID #9 at 75-76.) At Sgt. Bush's direction, he removed her handcuffs. (*Dionne BWC*, RE 14-5, PageID #132 at 3:07-4:47.)

Like the actions of Officer Barberino, Officer Dionne's actions did not violate any clearly established legal precedent. He was justified in placing Honestie in the cruiser for at least two reasons. First, this kept Honestie secure and away from the ongoing situation in the backyard of the house, thereby maintaining the status quo for the ongoing investigation. Second, the suspect had not yet been apprehended. If Whitney was not the suspect the officers were looking for, the real suspect, who was reportedly on foot and armed with a knife, might yet appear on the scene from any direction, and could potentially present a risk to Honestie. Consequently, placing Honestie in the cruiser was not only a means of providing her with warmth while officers sorted out the facts related to Whitney, it was also a means of protecting her for the duration. Officer Dionne's actions in this regard were neither "plainly incompetent" nor a knowing violation of the law. *Guertin*, 912 F.3d at 916; *Wyatt, supra,* at *3,5 (RE 14-8, PageID ##201, 203).

The District Court's finding that Officer Dionne was not entitled to qualified immunity was in error. Officer Dionne is entitled to qualified immunity and should be dismissed from this lawsuit.

### 5.    Officers Sellner and Barberino are each Entitled to Qualified Immunity on Plaintiff's Excessive Force Claim.

Plaintiff alleged that "Defendant Sellner, lacked any lawful basis to draw his weapon and point it towards Honestie" (*Compl.*, RE 1, PageID #16 at ¶136); that "Defendant Barberino lacked any lawful basis to handcuff Honestie" (*Compl.*, RE

36

1, PageID #16 at ¶138); and that their "actions of drawing their weapon and handcuffing Honestie constituted excessive force in violation of the Fourth Amendment." (*Compl.*, RE 1, PageID #17 at ¶146.)[8] But Plaintiff's assertions are conclusions of law, not allegations of fact. Therefore, as a matter of law, Plaintiff's claims are insufficient to defeat the Officers' assertion of qualified immunity under the particular circumstances presented here.

Defendants-Appellants acknowledge that a seizure is unreasonable under the Fourth Amendment if officers use excessive force. *Puskas v Del. Cnty.*, 56 F.4th 1088, 1093 (6th Cir. 2023) (citation omitted). However, "[w]hen making an arrest or an investigatory stop, the police have 'the right to use some degree of physical coercion or threat thereof to effect it.'" *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 865 (6th Cir. 2020), quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

"In deciding whether the force used was excessive, [the Court] balance[s] the government's interests in protecting others (including the police) and curbing crime against the suspect's right [] not to be injured." *Puskas*, 56 F.4th at 1093, citing *Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022). In this regard, the Court must determine "whether the officers' actions [were] 'objectively

---

[8] Although Officer Dionne is mentioned in Count III, no allegation is made that he employed excessive force. (*Compl.*, RE 1, PageID #16-18 at ¶¶131-151.)

reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

Further, an officer's "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "With respect to a claim of excessive force …[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham,* 490 U.S. at 396, quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir. 1973.) "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The Court should consider three factors in its analysis of the reasonableness of the officer's actions: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Vanderhoef v. Dixon,* 938 F.3d 271, 276 (6th Cir. 2019) (internal citation omitted). However, "[t]hese factors are not an exhaustive list because the ultimate question is whether 'the totality of the circumstances justifies [the] particular sort of seizure' that took place." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir.

38

2022)(citation omitted). Here, in light of the factual allegations made in the complaint and video footage properly before the Court, these basic factors play out as follows:

The first factor, the severity of the crime at issue, weighs in favor of the Officers. The Officers were investigating a reported stabbing that occurred at another location. (*Compl.*, RE 1, PageID #9 at ¶78.) The District Court found that a stabbing "is a serious crime." (*Opinion,* RE 30, PageID #384.)

The second factor, whether there was an immediate threat to the safety of the officers or others, weighs in favor of the Officers. According to the Complaint, the Officers "allegedly descended on Honestie's home in response to a call regarding a domestic incident unrelated to Honestie or any of the occupants of the house." (*Compl.,*RE 1, PageID #2 at ¶2.) The Complaint further alleges that "[i]t was determined that GRPD was looking for an adult Caucasian woman who had allegedly stabbed another individual at another location." (*Compl.*, RE 1, PageID #9 at ¶78.) The suspect in the stabbing was described as "an adult Caucasian woman, … wearing her hair in a ponytail bun and wearing a black coat." (*Compl.,* RE 1, PageID # 9 at ¶79.) The suspect was reported to have fled on foot with the knife that was used in the stabbing. (*Bush BWC,* RE 14-4, PageID #131 at 4:23-4:24.) When the Officers encountered Honestie, she "was standing on a step of the porch of her residence near her mother, Whitney." (*Compl.,* RE 1, PageID #7 at

¶51.)  In the dim light, Whitney appeared to be an adult Caucasian woman wearing her hair in a ponytail bun, consistent with the description of the stabbing suspect. (*Sellner BWC,* RE 14-7, PageID #134 at 0:00-0:35.) Consequently, if Whitney was the stabbing suspect, she was potentially still armed with a knife and could pose an immediate threat not only to the officers, but also to Honestie and Aisha who were standing on the step near her.

The third factor, actively resisting arrest or attempting to evade arrest by flight, was not alleged.  There are no allegations in Plaintiff's complaint regarding whether Whitney was resisting or attempting to evade arrest.  However, for purposes of this appeal, the Defendants-Appellants accept that neither Whitney nor Honestie were resisting or attempting to evade arrest. However, the suspect with the knife had fled and was being searched for.

Under this legal framework, both Officer Sellner and Officer Barberino are entitled to qualified immunity for their actions at the pleadings stage. As noted above, "[w]hen more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam).

### a. Officer Sellner did not Violate a Clearly Established Right.

The Sixth Circuit has held that "a police officer may approach a suspect with a weapon drawn during a *Terry* stop when the officer reasonably fears for his

safety." *Wright*, 962 F.3d at 865, citing *United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir. 1986) (other citation omitted). As stated in *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001): "[When the] surrounding circumstances give rise to a justifiable fear for personal safety, a seizure effectuated with weapons drawn may properly be considered an investigative stop." *Id*. (alteration in original), quoting *Hardnett*, 804 F.2d at 357.

Here, Officer Sellner was part of the investigation of a stabbing following which the suspect (described as an adult Caucasian woman with her hair in a ponytail bun) had fled on foot with the knife, possibly to the Hodges's address. When Officer Sellner encountered Honestie, she was standing on the back porch near Whitney, who appeared to match the suspect's description. (*Sellner BWC,* RE 14-7, PageID #134 at 0:00-0:35.) In these circumstances, a reasonable officer on the scene would have had his weapon drawn in justifiable fear that Whitney might harm the officers on the scene, or even one of the females standing near her. *U.S. v. Heath,* 259 F.3d 522, 530 (6th Cir. 2001).

The fact that Honestie herself did not match the description of the suspect and, in retrospect, was a bystander does not alter this legal conclusion. To the contrary, several courts, including the Sixth Circuit, have determined that pointing a gun at a bystander is insufficient to sustain a claim of excessive force. See, *Collins v. Nagle*, 892 F.2d 489, 497 (6th Cir. 1989) (officers did not use excessive

force by pointing guns at bystander who was on scene of arrest given police could not know bystander's intentions); *Murray ex rel Morrow v. Metropolitan Government of Nashville*, 2007 WL1521004 at *6 (M.D. Tenn. 2007) (officers did not use excessive force by pointing weapons at sister of suspect when situation with suspect not yet contained and officers did not know if they were dealing with a suspect with a real gun, how suspect would react upon his encounter with officers, or how the sister "fit into the dynamics of the situation").

Consequently, Officer Sellner's action in this case was justifiable and that of a reasonable officer under like circumstances.

### b.  Officer Barberino did not use Excessive Force.

While Plaintiff alleged that Officer Barberino used excessive force by handcuffing Honestie, her excessive force claim does not allege that the use of handcuffs caused Honestie physical injury. (*Compl.,* RE 1, PageID ##16-18.) Likewise, in response to Defendants' Motion to Dismiss, Plaintiff did not argue that the handcuffs caused Honestie injury. (*Pla. Resp. Br.,* RE 19, PageID ##275-278.)

Under Sixth Circuit case law, Plaintiff failed to state a claim for excessive force by merely handcuffing Honestie.

> [The Sixth Circuit has] held that "excessively forceful or unduly tight handcuffing is a constitutional violation under the Fourth Amendment" and that "freedom from excessively forceful or unduly tight handcuffing is a clearly established right for purposes of

42

qualified immunity." *Baynes v. Cleland*, 799 F.3d 600, 613-14 (6th Cir. 2015); see also, *Marvin v. City of Taylor*, 509 F.3d 234, 247 (6th Cir. 2007) ("an excessive force claim can be premised on handcuffing, i.e., the right not to be handcuffed in an objectively unreasonable manner was clearly established"). **To plead successfully a claim of excessively forceful, handcuffing, the plaintiff must allege physical injury from the handcuffing.** "[W]hen there is no allegation of physical injury, handcuffing of an individual incident to a lawful arrest is insufficient as a matter of law to state a claim of excessive force under the Fourth Amendment." *Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001).[9]

*Courtright v. City of Battle Creek*, 839 F.3d 513, 518-519 (2016) (emphasis added; citations and quotations in original).

The District Court's analysis of the excessive force claim was inconsistent with the law. The District Court concluded that it was "not persuaded that the ordinary application of handcuffs can never give rise to an excessive force claim." (*Opinion,* RE 30, PageID #387.) But the standard of law necessary to make out a viable claim for excessive force (such that an Officer is not entitled to qualified immunity) is that the right must be clearly established – so clearly established that any reasonable officer would know that what they are doing is illegal. *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Instead, the District Court concluded that Officer Barberino's use of handcuffs was excessive force, and that it was an "obvious case .... where the unlawfulness of

---

[9] The same must be true for the use of handcuffs during an investigatory stop since what "[t]he Fourth Amendment prohibits [is the] unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (emphasis added).

[Defendants'] conduct is sufficiently clear." (*Opinion,* RE 30, PageID #388, citations omitted.)  In so holding, the District Court quoted *District of Columbia v. Wesby.* However, the court in *Wesby* found that the officers there **were** entitled to qualified immunity because they "reasonably but mistakenly concluded that probable cause was present" to arrest the plaintiffs, and that the "obvious case" which does not require specific legal precedent to be clearly established is "rare." *Wesby,* 583 U.S. at 590-91.

Officer Barberino's use of handcuffs was warranted under the circumstances and was not excessive force. *See, e.g. Valdez v. United States*, 58 F.Supp.3d at 817. As Plaintiff has not alleged that Honestie suffered physical injury from the application of the handcuffs or that the handcuffing was "excessively forceful," the excessive force claim against Officer Barberino is insufficient as a matter of law to state a claim. *Courtright*, 839 F.3d at 519; *Neague*, 258 F.3d at 508. Handcuffing alone, especially in this context, is not such a "rare, obvious case" that any reasonable officer in like circumstances would know that what they did violated clearly established law. *Wesby,* 583 U.S. at 590-91.  The District Court's erroneous conclusion that Officer Barberino was not entitled to qualified immunity should be overturned and dismissal granted.

**C.    STANDARD OF REVIEW: THIS COURT REVIEWS THE DISTRICT COURT'S DECISION NOT TO VIEW MATERIALS OUTSIDE THE PLEADINGS FOR ABUSE OF DISCRETION**

The District Court declined to consider an Incident Report (RE 14-3, PageID ##120-130) and the Computer Automated Dispatch (CAD) Event Report (RE 14-1, PageID ##114-118) that the Officers attached to their Motion to Dismiss for the limited purpose of showing why the Officers went to the Hodges's address on December 6, 2017. (*Def. Brief,* RE 14, PageID #76 at n.3.)

The Sixth Circuit "reviews the district court's treatment of materials outside the pleadings for abuse of discretion, *see*, *Wysocki v. Int'l Bus. Mach. Corp*., 607 F.3d 1102, 1104 (6th Cir. 2010), which occurs when the district court 'relies on clearly erroneous findings of fact, applies the law improperly, or uses an erroneous legal standard[.]'" *Wershe v. City of Detroit, Michigan*, 112 F.4th 357, 373 (6th Cir. 2024), quoting *United States v. Pembrook*, 609 F.3d 381, 385 (6th Cir. 2010).

**D.    THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO CONSIDER THE INCIDENT REPORT OR THE CAD EVENT REPORT.**

**1.    On a Motion to Dismiss, the Court Considers Materials Outside the Pleadings in Some Circumstances.**

Generally, a court may not consider evidence outside of the pleadings when deciding a motion to dismiss. *Rondigo, L.L.C. v. Twp. of Richmond,* 641 F.3d 673, 681 (6th Cir. 2011)(citations omitted).  However, there are certain exceptions. The

court may consider not only the complaint itself, but also any "exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Ass'n.,* 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted).

More importantly, the court may properly consider materials allegedly outside the pleadings when "those matters simply fill[] in the contours and details of plaintiff's complaint and add[] nothing new." *Yeary v. Goodwill Industries-Knoxville, Inc.,* 107 F.3d 443, 445 (6th Cir. 1997). In *Yeary,* this Court pointed out that when a document does "nothing more than verify the complaint," and when it "add[s] nothing new, but in effect, reiterate[] the contents of the complaint itself," it is not truly "material[]… outside the pleadings." *Id.*, citing, *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993).

The reason for these exceptions is simple: a plaintiff should not be able to limit review of extraneous documents or materials that are central to their claim by failing to attach those items that are embraced in their allegations. *See, e.g.*, *Wiener v. Klais and Co., Inc.,* 108 F.3d 86, 89 (6th Cir. 1997), abrogated on other grounds, *D.S.S by and through McDowell v. Prudential Ins. Co. of America*, No. 21-5315, 2022 WL 95165 at *3 (6th Cir. 2022). To hold otherwise would allow a plaintiff with a legally deficient claim to survive a motion to dismiss simply by hiding the

materials upon which the plaintiff relied in drafting her complaint. *Weiner,* 108 F.3d at 89.

In addition, the use of "outside" documents that fall within the parameters discussed above do not require the court to convert a motion to dismiss to one for summary judgment.  As noted by the Second Circuit Court of Appeals:

> … the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason – requiring notice so that the party against whom the motion to dismiss is made may respond - that 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

*Cortec Industries, Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2nd Cir. 1991).

Under these rules, the Incident Report and CAD Report were properly before the Court because:

- they were "public records;"

- they were referred to in the Complaint and were central to the claims contained therein;

- they "simply filled in the contours and details of Plaintiff's Complaint and added nothing new;" and

- Plaintiff had actual notice of the documents and relied upon them in framing her Complaint.

47

## 2. The Incident Report and CAD Report are both Public Records.

Without discussion, the District Court found that the Officers' Incident Report and CAD Report were not public records (*Opinion*, RE 30, PageID #378) despite Plaintiff's acknowledgement that "the exhibits may technically qualify as public records[.]" (*Pl. Resp. Br.*, RE 19, PageID #261.) In this regard, the District Court applied the law improperly and abused its discretion.[10]

First, under Federal Rule of Evidence 803(8), police reports are considered public records when they include matters observed while under a legal duty to report. FRE 803(8)(A)(ii); *Dortch v. Fowler,* 588 F.3d 396, 402 (2009) (officer's accident report admissible under the Public Records exception to the hearsay rule). This rule also extends to the CAD Report as "[a] record or statement of a public office" [that] "sets out… the office's activities[.]" FRE 803(8)(A)(i). *See, Moore v. City of Cincinnati,* No. C-1-08cv-05, 2009 WL 1079663 at *1, n. 1 (S.D. Ohio, 2009) ("Moreover, the CAD Report constitutes a public record the consideration of which does not serve to convert Defendants' Motion to Dismiss into one for

---

[10] While this Court has not *expressly* defined what can be considered a "public record" when it comes to documents offered in support of a Motion to Dismiss on the pleadings, various documents have been recognized by courts within this Circuit as appropriate for a motion to dismiss.

summary judgement")(citations omitted). Consequently, both documents constituted "public records" under federal law.[11]

Nonetheless, the District Court found that it was "not obligated to consider evidence that is 'subject to reasonable dispute' or that 'captures only part of the incident and would provide a distorted view of the events at issue[,]'" (*Opinion*, RE 30, PageID #378) (citation omitted). The Court then went on, without analysis, to conclude that the "foregoing documents are potentially subject to dispute and might provide a distorted view of events." *Id*.

The Court's conclusion flies in the face of the allegations in the Complaint. Plaintiff alleged that the Officers "descended" on the Hodges's residence "*in response to a call*" about a stabbing. (Compl., RE 1, PageID ##1, 9 at ¶¶ 2, 78, emphasis added.) Moreover, Plaintiff herself, while being somewhat coy in her pleadings, has never argued that the Officers were not dispatched specifically to

---

[11] The District Court incorrectly found that the records "appeared to be hearsay." (*Opinion*, RE 30, PageID #378). However, these records were not offered for the truth of the matter asserted in them, but merely to show what information the Officers had that prompted them to go to the Hodges's residence and act with caution. "A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." *Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365, 379 (6th Cir. 2009), citing *United States v. Horton,* 847 F.2d 313, 324 (6th Cir. 1988).

49

her address because the armed stabbing suspect was reportedly heading there.[12]
Nor has she ever disputed that the suspect was described as an adult Caucasian
female wearing her hair in a ponytail bun. To the contrary, Plaintiff specifically
plead the description of the stabbing suspect in her Complaint (*Compl*. RE 1,
PageID #9 at ¶¶ 78-79), likely based on these same two documents. Consequently,
the CAD Report and the Incident Report, which were proffered for the limited
purpose of showing why the officers were at the Hodges address, and who they
were looking for, are not "subject to reasonable dispute" nor do they "provide a
distorted view of the events at issue," as the Court suggested (but never explained).

### 3. The CAD Report was Referred to in the Complaint and is Central to Plaintiff's Claims.

The CAD Report contained the following statement regarding the white,
female suspect:

> (7:15:43 pm) "suspect wearing hair in a ponytail bun, black coat,
> might flee to 1509 Turner." (*CAD Report*, RE 14-1, PageID #115.)

The Complaint states: "The suspect, an adult Caucasian woman, was described as
wearing her hair in a ponytail bun and wearing a black coat." (*Compl*., RE 1,

---

[12] Plaintiff's only objection to the documents was that they "*could* contain
inaccurate, misleading, or flat-out wrong information." (*Pl. Resp. Br.,*
RE 19, PageID #261-262, emphasis added). However, she did not identify any
"inaccurate, misleading, or flat-out wrong information" whatsoever, much less
challenge the statements describing the suspect (which information Plaintiff
included in her complaint) or that the suspect reportedly might flee to the Hodges's
address.

PageID #9 at ¶79.) In other words, this allegation uses nearly identical language to that on the CAD Report. This shows that the CAD Report was relied on by the Plaintiff when drafting her pleading.

More importantly, the facts stated in the CAD Report were central to Plaintiff's claims. Plaintiff has repeatedly plead and argued that the actions taken by the Officers with respect to Honestie violated her rights specifically *because* Honestie did not match the description of the stabbing suspect. [*See e.g., Compl.,* RE 1, PageID ##1 and 9, at ¶3 ("Honestie Hodges, at 11 years old and African American, did not in any way fit the description of GRPD's suspect, who was an adult Caucasian woman"), ¶81 ("Honestie's hair was not in a ponytail bun"); *Pl. Resp. Brf.*, RE 19, PageID #277 ("Defendants argue that 'in the dim light, **Whitney** appeared to be a white female with her dark hair in a bun, consistent with the description of the stabbing suspect.' … And that's exactly the point. Defendants pointed guns at Honestie and placed handcuffs on her even though she **did not** fit the description of the suspect. Not at all.") (emphasis in original).] Consequently, the CAD Report was properly before the Court, and the District Court abused its discretion by excluding it from consideration.

### 4. The Reports Simply Filled in the Contours of Plaintiff's Complaint.

For these same reasons, the CAD Report and the Incident Report simply filled in the contours and details of Plaintiff's Complaint and added nothing new.

The Complaint alleges that officers "descended" on the Hodges's residence "in response to a call regarding a domestic incident," (*Compl.*, RE 1, PageID #2 at ¶2), later described by Plaintiff as a stabbing by a white female suspect wearing her hair in a ponytail bun (*Compl.* RE 1, PageID #9 at ¶¶ 78-79). The CAD Report and Incident Report merely explain why the officers "descended" on the residence (because they had information that the suspect "might flee to 1509 Turner") (*CAD Report*, RE 14-1, PageID #114; *Incident Report*, RE 14-3, PageID #120-130) and confirm the description of the suspect that Plaintiff, herself, invoked. (*CAD Report*, RE 14-1, PageID # 114; *Compl.*, RE 1, PageID #9 at ¶¶ 78-79.).

In this regard, the Court never addressed, much less distinguished, this basis for considering the CAD Report or the Incident Report.  In failing to do so, the District Court improperly applied the law.

### 5. Plaintiff had Actual Knowledge of the CAD Report and the Incident Report, Relying on Both in Framing Her Complaint.

Given that the Complaint uses virtually the same language as the CAD Report to describe the stabbing suspect, it is apparent that Plaintiff had actual knowledge of the document and, as discussed above, relied upon it in framing her Complaint.  Moreover, Plaintiff has never denied that she possessed either the

CAD Report or the Incident Report and is not expected to make such a denial now.[13]

Consequently, consideration of the CAD Report and the Incident Report, was warranted in this case to the extent that: (a) the documents filled in the contours of Plaintiff's Complaint as to the totality of the circumstances facing the Officers; and (b) were properly before the Court. But, even without these documents, the allegations in the Complaint itself make clear that the Officers went to Plaintiff's home specifically in response to a call about a stabbing and that they were searching for a suspect who was an adult Caucasian female wearing her hair in a ponytail bun. (*Compl.*, RE 1, PageID ##2 and 9, at ¶¶2, 78-79.)  Not even Plaintiff denies that she fit this very description. As a result, the Officers faced a potentially armed and dangerous suspect in a dark and confined area who not only presented a potential risk to the Officers, but to the others (including Honestie) within her reach. In such rapidly evolving and tense circumstances, the actions of these three Officers can only be described as objectively reasonable. Qualified immunity must therefore apply as a matter of law.

---

[13] Plaintiff's counsel has had a copy of the CAD Report since approximately July 17, 2018, when the City disclosed the materials to the Michigan Department of Civil Rights, and copied Attorney Drew, in connection with the claim filed by Whitney Hodges on behalf of her daughter over this same incident (MDCR No. 485649).

## IV.    <u>CONCLUSION</u>

Appellants, Officers Sellner, Barberino, and Dionne, respectfully request that this Court reverse the District Court's Order, grant them each qualified immunity as to each of Plaintiff's claims contain in Counts I, II, and III of the Complaint, and dismiss this action with prejudice.

Respectfully submitted,

Dated: October 1, 2024                    By: */s/ Sarah J. Hartman*
                                          Sarah J. Hartman (P71458)
                                          Assistant City Attorney
                                          *Attorney for Defendants-Appellants*
                                          300 Monroe Ave. NW, Ste. 620
                                          Grand Rapids, MI 49503
                                          (616) 456-3802

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the limitations set forth in Fed. R. App. P. 32(a)(7)and (g), as this brief contains 12,911 in Times New Roman, 14 point, proportional font.  The word processing software used to prepare this brief was Microsoft Word 365.


Respectfully submitted,


Dated: October 1, 2024          By: */s/ Sarah J. Hartman*
                                Sarah J. Hartman (P71458)
                                Assistant City Attorney
                                *Attorney for Defendants-Appellants*
                                300 Monroe Ave. NW, Ste. 620
                                Grand Rapids, MI 49503
                                (616) 456-3802
                                shartman@grand-rapids.mi.us

# CERTIFICATE OF SERVICE

SARAH J. HARTMAN, Assistant City Attorney for the City of Grand Rapids, as attorney for Defendants-Appellants, being first duly sworn, states that on the 1st day of October 2024, she caused a copy of this document to be served electronically on all parties of record so registered with the United States Court of Appeals for the Sixth Circuit, and via U.S. Mail to any counsel not registered to receive electronic copies, by enclosing same in a sealed envelope with first class postage fully prepaid, addressed to their address(es) of record herein, and depositing same in a receptacle for U.S. Mail.

Respectfully submitted,

Dated: October 1, 2024

By: */s/ Sarah J. Hartman*
Sarah J. Hartman (P71458)
Assistant City Attorney
*Attorney for Defendants-Appellants*
300 Monroe Ave. NW, Ste. 620
Grand Rapids, MI 49503
(616) 456-3802
shartman@grand-rapids.mi.us

# ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry | Description | Page(s) |
|---:|---|---|
| 1 | Complaint | PageID #1-32 |
| 13 | Motion to Dismiss | PageID #65-66 |
| 14 | Brief in Support of Motion to Dismiss | PageID #67-113 |
| 14-1 | Exhibit A: CAD Report | PageID #114-118 |
| 14-2 | Exhibit B: Barberino BWC* | PageID #119 |
| 14-3 | Exhibit C: Incident Report | PageID #120-130 |
| 14-4 | Exhibit D: Bush BWC* | PageID #131 |
| 14-5 | Exhibit E: Dionne BWC* | PageID #132 |
| 14-6 | Exhibit F: Bloom BWC* | PageID #133 |
| 14-7 | Exhibit G: Sellner BWC* | PageID #134 |
| 14-8 | Exhibit H: Unpublished Cases | PageID #135-204 |
| 14-9 | Exhibit I: *Lyoya v. Schurr, et al* Opinion | PageID #205-225 |
| 17 | USB of Video | PageID #236 |
| 19 | Response in Opposition to Motion to Dismiss | PageID #246-299 |
| 19-1 | Exhibit 1: *Rideout v. Shelby Tp.* | PageID #300-312 |
| 19-2 | Exhibit 2: *Streeter v. Macomb Cty.* | PageID #313-321 |
| 25 | Reply in Further Support of Motion | PageID #347-361 |
| 25-1 | Exhibit A: *Ealey v. Rockford Const.* | PageID #362-366 |
| 30 | Opinion | PageID #372-400 |

| | | |
|---|---|---|
| 31 | Order | PageID #401 |
| 45 | Notice of Appeal | PageID #577-578 |

**\*** Video files provided to the Court via USB Drive.

## ATTACHED DECISIONS

*Moore v. City of Cincinnati*,
    No. C-1-08cv-05, 2009 WL 1079663 (S.D. Ohio, March 31, 2009)

*Murray ex rel Morrow v. Metropolitan Government of Nashville*,
    No. 3:06-0570, 2007 WL1521004 (M.D. Tenn., May 21, 2007)

*Wyatt v. Blair*,
    Mich. Ct. of App., Dkt. 259750 (August 2, 2006)

2009 WL 10709663
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western Division.

Kenneth MOORE, Plaintiff

v.

CITY OF CINCINNATI, et al., Defendants

Case No. C-1-08cv-05
|
Signed 03/31/2009

**Attorneys and Law Firms**

Gary Francis Franke, Michael Dillon O'Neill, Cincinnati, OH,
for Plaintiff.

Peter J. Stackpole, City of Cincinnati Office of City Solicitor,
Cincinnati, OH, for Defendants.

## REPORT AND RECOMMENDATION

Timothy S. Hogan, United States Magistrate Judge

**\*1** This matter is before the Court on Defendants' Motion
to Dismiss Plaintiffs Complaint (Doc. 4), and Plaintiff's
Memorandum in Opposition to Defendants' Motion to
Dismiss Plaintiff's Complaint (Doc. 8).

Defendants seek dismissal of Plaintiff's Complaint for failure
to state a claim upon which relief may be granted pursuant to
Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

On April 30, 2007, Plaintiff, Kenneth Moore, was driving
to work, proceeding on Colerain Avenue within the City
of Cincinnati, Hamilton County, Ohio in a vehicle owned
by Moore. At approximately 1:03 a.m. Defendant, Officer
Cecelia Charron, driving a marked Cincinnati Police cruiser,
began to follow him. Officer Charron's cruiser was equipped
with a video recorder that documents approximately thirty-
five (35) minutes of the two (2) hour incident. [1]

Officer Charron followed Moore's vehicle for approximately
one minute and twenty seconds before activating the lights
on the cruiser, initiating a traffic stop. Moore was driving his

1989 blue, two door, Honda Accord, license plate number
DTU7030. Officer Charron entered Moore's vehicle license
plate number into the cruiser Mobile Data Computer("MDC")
and received information indicating a 1989 gold, four door,
Honda Accord, with a license plate number of AKF8117, as
a possible stolen vehicle.

Officer Charron initiated a traffic stop. Plaintiff pulled his
vehicle to the side of the road to comply with the stop. There
is no dispute that, throughout the entire incident, Plaintiff
was completely cooperative with every request by the officers
involved.

Following the initiated stop, Officers Charron and Stone
approached Plaintiff's vehicle. Officer Charron approached
the driver's side of Plaintiff's vehicle with her taser drawn
and Officer Stone approached the passenger side with her
firearm drawn. From the rear of Plaintiff's vehicle, Officer
Charron ordered Moore to place his hands outside his driver's
side window, then ordered Moore to exit the vehicle and
walk backwards toward the officers with his hands exposed.
Plaintiff complied.

Officer Charron kept her taser pointed at Plaintiff while
Officer Stone placed Plaintiff in handcuffs. Once Plaintiff
was in handcuffs, Officer Charron deployed her taser, striking
Plaintiff. Immediately upon discharging her taser, Officer
Charron can be heard to exclaim "Oh shit!" She then called
for a supervisor to come to the scene of an accidental tasing.
At approximately 1:14:00, six and one-half minutes after
Plaintiff was struck by the taser, fire department personnel are
observed arriving on the scene. (Doc. 5; Videotape in Support
of Motion to Dismiss). [2] Four firefighters were present and
were observed examining and treating Plaintiff from 1:15:00
until 1:18:20, per Officer Stone's MVR. At this time, Plaintiff
made no complaints of pain nor requested medical treatment.
Plaintiff can further be heard to state to Defendant Charron,
"It's okay ma'am. It's all right. I'm all right." (Id.). Defendant
Charron apologized to Plaintiff several times, indicating that
it was her fault he was tased and that it was an accident.
Plaintiff was taken out of handcuffs by 1:18:45, per Officer
Stone's mobile video recorder ("MVR"). (Id.). Plaintiff claims
he was in custody for approximately two (2) hours and then
released without medical care. Plaintiff claims he then left the
scene and went to the hospital for treatment.

## OPINION

**\*2** Defendant's motion is brought pursuant to the provisions of Rule 12(b)(6) Federal Rules of Civil Procedure. The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993), citing *Nishiyama v. Dickson County, Tennessee*, 814 F.2d 277, 279 (6th Cir. 1987). To that end, for purposes of a motion to dismiss under the Rule, the complaint must be construed in a light most favorable to the nonmoving party and its allegations taken as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Miller v. Curris*, 50 F.3d 373, 377 (6th Cir. 1995). To survive a motion to dismiss under Rule 12(b)(6), "a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)(citations and internal quotation marks omitted). As the court stated in *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Consequently, a complaint will not be dismissed under Rule 12(b)(6) unless no law supports the claim made, the facts alleged are insufficient to state a claim, or an insurmountable bar appears on the face of the complaint. Thus, the Court is not concerned at this time with resolving the facts or the merits of the case, but rather the formal sufficiency of the statement of the claim for relief. *See Klusty v. Taco Bell Corporation*, 909 F.Supp. 516 (S.D. Ohio 1995).

**Plaintiff's § 1983 Claim**

<u>City of Cincinnati, and Defendants Streicher, Wright.</u>
<u>Battison. Stone and Charron, in their Official Capacities</u>
"It is firmly established that a municipality, cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000), citing *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. To state a claim for relief against the City of Cincinnati for his injuries, Plaintiff must allege that "those injuries were the result of an unconstitutional policy or custom" of the City. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). *See Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996). *See also Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)(municipal policy must be "moving force" behind constitutional deprivation).

Municipalities and other governmental entities cannot be held responsible for a constitutional deprivation unless there is a direct causal link between a policy or custom and the alleged deprivation. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018; *Deaton v. Montgomery County, Ohio*, 989 F.2d 885, 889 (6th Cir. 1993).

A § 1983 action against a municipal official in his official capacity is to be treated as an action against the municipality itself. *See Barber v. City of Salem*, Ohio, 953 F.2d 232, 237 (6th Cir. 1992). Thus, Plaintiff's § 1983 claim against Police Chief Streicher, Fire Chief Wright, Sergeant Battison, Officer Stone, and Officer Charron, in their official capacities must be treated as one against the City itself.

"A local government may be found liable for policies set by its lawmakers 'or by those whose edicts or acts may fairly be said to represent official policy.' " *Davenport v. Simmons*, 192 F.Supp.2d 812, 824 (W.D. Tenn. Sept. 13, 2001)(quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018). Under *Monell*, a custom "must be so permanent and well settled as to constitute a custom or usage with the force of law." In order to show a custom or policy, Plaintiff must cite specific facts in support of his claim. Conclusory allegations are not sufficient. *Culberson v. Doan*, 125 F.Supp.2d 252, 263-64 (S.D. Ohio 2000). It is well established that a municipality may not be held liable solely on the basis of respondeat superior. *See Brown*, 520 U.S. at 404, 117 S.Ct. 1382; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 F.3d 163, 166,( 113 S.Ct. 1160, 122 L.Ed.2d 517,1993); *Collins v. City of Marker Heights, Tex.*, 503 U.S. 115, 121, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *City of Canton*, 489 U.S. at 392, 109 S.Ct. 1197; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-22, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur*, 475 U.S. at 478, 106 S.Ct. 1292. Plaintiff fails to allege any facts showing that any individual police officer acted pursuant to a policy or custom of the City of Cincinnati.

**\*3** In order to prevail on a Section 1983 "failure to train" claim, the plaintiff must show that the "training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citations omitted). *See also Cherrington v. Skeeter*, 344 F.3d 631 (6th Cir. 2003). The Supreme Court recognized municipal liability under 42 U.S.C. § 1983 for failure to train employees in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Case: 24-1615    Document: 23    Filed: 10/01/2024    Page: 72

Moore v. City of Cincinnati, Not Reported in Fed. Supp. (2009)

As stated above, in order to maintain a § 1983 claim, Plaintiff must show: (1) that defendant was acting under color of state law, or was a state actor; and (2) that defendant deprived him of a constitutional right. *West v. Atkins*, 487 U.S. 42, 50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Where as here, the defendant is a municipality, defendant generally cannot be held liable under § 1983 on a *respondeat superior* theory. *Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, in order to prevail against a municipality in a § 1983 action, Plaintiff must demonstrate a causal connection between a policy or custom of the municipality and the injuries Plaintiff allegedly suffered. *Johnson v. Hardin County*, 908 F.2d 1280, 1285 (6th Cir. 1990).

In this case, Plaintiff has failed to identify any policy or custom of the City of Cincinnati which allegedly gave rise to his injuries. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Nor has Plaintiff demonstrated that the City in some way encouraged the misconduct about which he complains. *See Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Moreover, Plaintiff has failed to show that the City's training program is inadequate with respect to the use of tasers and other tasks related to a felony traffic stop.

For the reasons stated above, Plaintiff's § 1983 claim against the Defendant City of Cincinnati, Police Chief Streicher, Fire Chief Wright, and Sergeant Battison, in their official capacities should be dismissed.

Police Chief Streicher and Fire Chief Wright in their Individual Capacities

As stated above, liability under § 1983 cannot be premised on the doctrine of *respondeat superior*. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A supervisor cannot be held liable unless there is evidence he directly participated in or encouraged the specific incident of misconduct. *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy*, 729 F.2d at 421; *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). Where a supervisor is found to have abandoned

the specific duties of his position, such as adopting and implementing a particular operating procedure, liability is direct, not vicarious. *Taylor v. Mich. Dept. of Corrections*, 69 F.3d 76 (6th Cir. 1995). "[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.' " *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), citing *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998), *cert. denied*, 526 U.S. 1115, 119 S.Ct. 1763, 143 L.Ed.2d 793 (1999).

**\*4** Plaintiff's Complaint is unclear as to whether Defendants Streicher and Wright are being sued in their individual or official capacities. Absent clear indication that a public official is being sued in his individual capacity, courts must assume the official is being sued in his official capacity. *Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir. 1991). Nonetheless, to the extent Defendants Streicher and Wright were named as defendants simply due to their supervisory positions, Plaintiff's claim against them must fail. Plaintiff does not allege, and has failed to establish, that Defendants Streicher or Wright were personally involved in any of Plaintiff's claims. Likewise, he has offered no evidence that Streicher or Wright "implicitly authorized, approved or knowingly acquiesced" in the alleged unconstitutional conduct. *Bellamy* 729 F.2d at 421. There is simply no evidence mat Defendants Streicher and Wright were personally involved with the actions of Officers Charron and Stone or the fire personnel which relate to Plaintiff's § 1983 claim.

Defendant Battison in his Individual Capacity

Following the tasing of Plaintiff, Defendant Charron requested mat the police dispatch "[g]et me a boss for an accidental tasing." (Doc. 5). Sergeant Battison responded. Defendant Battison arrived on the scene at 1:13:37, per Officer Stone's MVR. He inquired as to what had happened, to which Defendant Charron replied that it was her fault and the Plaintiff did nothing to resist. (Id.). During mis investigation, Sergeant Battison asked if Plaintiff was under arrest for anything, and when Defendant Charron replied in the negative, Battison directed the officers to remove Plaintiffs handcuffs. It is clear from the MVR that Defendant Battison was not on the scene until after the tasing.

As stated above, liability under § 1983 cannot be premised on the doctrine of respondeat superior. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A supervisor cannot be held liable unless there is evidence he directly participated in or encouraged the specific

incident of misconduct. *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), cert. denied, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly aumorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy*, 729 F.2d at 421; *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir.), cert. denied, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). "[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.' " *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), citing *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998), cert. denied, 526 U.S. 1115, 119 S.Ct. 1763, 143 L.Ed.2d 793 (1999).

Plaintiff does not allege, and has failed to establish, that Defendant Battison was personally involved in any of Plaintiff's claims. Likewise, he has offered no evidence that Battison "implicitly authorized, approved or knowingly acquiesced" in the alleged unconstitutional conduct. *Bellamy* 729 F.2d at 421. There is simply no evidence that Defendant Battison was personally involved with the actions of Officers Charron and Stone or the fire personnel which relate to Plaintiff's § 1983 claim. As such, we find that Plaintiff's § 1983 claim against Defendant Battison should be dismissed.

### Defendant Stone in her Individual Capacity

In order to prevail on his § 1983 claim against Defendant Stone, Plaintiff must show that the officer deprived him of a right secured by the Constitution or other federal laws. *See Foy v. City of Berea*, 58 F.3d 227, 229 (6th Cir. 1995). Defendants contend that Plaintiff has not shown the denial of a protected right and, in the alternative, that Officer Stone is entitled to the defense of qualified immunity. Police officers are entitled to qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *See Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**\*5** When the defense of qualified immunity is raised, the Court should determine first whether the qualified immunity attaches. *See Saucier v. Katz*, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("When a defendant seeks qualified immunity a ruling on that issue should be made early in the proceedings so that costs and expenses of trial are avoided where the defense is dispositive").

Government officials performing discretionary functions [3] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity insulates government officials from individual liability for money damages. *See, e.g., Cagle v. Gilley*, 957 F.2d 1347, 1350 (6th Cir. 1992).

Recently, the Supreme Court ruled that federal courts were no longer bound to follow the "inflexible requirement" set out in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *Pearson v. Callahan*, 555 U.S. 223 at ——, 129 S.Ct.808, 813, 172 L.Ed.2d 565 (Jan. 21, 2009). *Saucier* outlined a two-step analysis for qualified immunity: first, whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and second, whether that right was clearly established. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. After evaluating the "considerable body of new experience ... regarding the consequences of requiring adherence to this inflexible procedure," the Supreme Court concluded that while the sequence may often be appropriate, "it should no longer be regarded as mandatory." *Pearson*, 129 S.Ct. at 817. "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818.

A constitutional right is "clearly established," thereby precluding the application of qualified immunity, if "the law [is] clear in regard to the official's particular actions in the particular situation." *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*, quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The official, therefore, will be immune "if officers of reasonable competence could disagree" on whether his conduct violated the plaintiffs rights. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

If the allegations could make out a constitutional violation, we must ask whether the right was clearly established - - that is, whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

Moore v. City of Cincinnati, Not Reported in Fed. Supp. (2009)

Case: 24-1615    Document: 23    Filed: 10/01/2024    Page: 74

*Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. If an officer makes a reasonable mistake as to what the law requires, the officer is entitled to immunity. *Id.* at 205, 121 S.Ct. 2151. A police officer may be entitled to qualified immunity even though she has in fact violated the plaintiff's rights. *Greene*, 310 F.3d at 894. "[R]easonable mistakes can be made as to the legal restraints on particular police conduct." *Id.* (citing *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151). "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, ... and in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable." *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034.

**\*6** The Fourth Amendment generally prohibits arrests which are not supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 207-08, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). However, the MVR in the present case illustrates that Defendant Stone was providing cover to Defendant Charron for a felony traffic stop. It is undisputed that the stop was initiated by Defendant Charron based upon the mistaken belief that Plaintiff's vehicle was stolen. Defendant Stone was not privy to the CAD Report upon which Defendant Charron based her decision to stop Plaintiff. Accordingly, we find that Defendant Stone operated under a reasonable, albeit a mistaken, belief that probable cause existed for the traffic stop. For this reason, we find that Defendant Stone is entitled to qualified immunity and Plaintiff's § 1983 claim against her should be dismissed.

<u>Defendant Charron in her Individual Capacity</u>

As discussed above, the Fourth Amendment generally prohibits arrests made without probable cause. *Dunaway*, 442 U.S. at 207-08, 99 S.Ct. 2248. However, while a reasonable mistake as to what the law requires may entitle an office to immunity, *Saucier*, 533 U.S. at ——, 121 S.Ct. 2151, an unreasonable mistake will not. The question with respect to Defendant Charron focuses on whether her mistaken belief that probable cause existed for the traffic stop was reasonable. Defendant Charron contends that she ran Plaintiffs license plate through her MDC and received information indicating that Plaintiff's car was stolen. Plaintiff argues that the CAD Report clearly indicates that Plaintiff's car was not stolen. At the time of the incident, Plaintiff was driving a 1989 blue, two door, Honda Accord with a license plate number of DTU7030. Defendant Charron ran Plaintiff's plate number through her MDC and received information indicating that a 1989 gold, four door, Honda Accord, with a license plate number of AKF8117 was reported stolen. Officer Charron

can be heard questioning why she received a "VIN hit" on Plaintiffs plate number and stating that "maybe [she] misread it." (Doc. 5 at 1:20:44 - 1:20:50). Plaintiff has provided the Court with a copy of the CAD Report upon which Defendant Charron relied, which details the differences between Plaintiff's vehicle and the stolen vehicle. As Plaintiff points out, the only similarity between Plaintiff's vehicle and the reported stolen vehicle was the year and manufacturer. Neither the license number, color or make of the two vehicles matched. On the other hand, Defendants have provided the Court with no basis for Officer Charron's mistaken belief that there was information in the CAD Report upon which she could find probable cause to stop Plaintiff's vehicle, other than her statement that she received a "VIN hit." We, therefore, find that questions of material fact exist as to whether Defendant Charron's belief that probable cause existed to stop Plaintiff was reasonable. As such, Defendant Charron is not entitled to qualified immunity with respect to Plaintiff's § 1983 claim and Defendants' Motion to Dismiss should be denied with respect to this claim.

**State Law Tort Claims**

Plaintiff also brings state law claims of assault and battery, intentional infliction of emotional distress, negligence and negligent infliction of emotional distress. Defendants argue that the state law claims against them in their official capacity, which are treated as claims against the City itself, should be dismissed because the City is entitled to sovereign immunity under Ohio Revised Code § 2744.02. Defendants further argue that they are immune from Plaintiff's state law claims against them in their individual capacities pursuant to O.R.C. § 2744.03. Plaintiff, in his memorandum, does not refute Defendants' contentions on this issue.[4] For this reason alone, we find that Plaintiff's state law tort claims should be dismissed against Defendants in both their official and individual capacities. *See Fisher v. Cincinnati*, 753 F.Supp. 681 (S.D. Ohio 1990).

**\*7**

    **IT IS THEREFORE RECOMMENDED THAT:**

1) Defendants' Motion to Dismiss (Doc. 4) be GRANTED in part and DENIED in part in accordance with the decision herein.

2) Count I be DISMISSED with respect to the all Defendants in their official capacities and Defendants Streicher, Wright, Battison, and Stone in their individual capacities.

Case: 24-1615    Document: 23    Filed: 10/01/2024    Page: 75

**Moore v. City of Cincinnati, Not Reported in Fed. Supp. (2009)**

3) Counts II - IV be DISMISSED.

4) Counts V and VI be DISMISSED.

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10709663

---

## Footnotes

1    While Defendants claim the entire incident lasted approximately 34 minutes, the Computer Aided Dispatch ("CAD") Report indicates a 2 hour, 2 minute and 40 second encounter. (Doc. 8, Ex. 2, CAD Report, attached). Moreover, the CAD Report constitutes a public record the consideration of which does not serve to convert Defendants' Motion to Dismiss into one for summary judgment. *See Kostrzewa v. City of Troy*, 247 F.3d 633, 644 (6th Cir. 2001)(A district court may consider public records in deciding a motion to dismiss without converting the motion to one for summary judgment)(citing *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) ).

2    The video recording of the traffic stop also constitutes a public record of which the Court can take judicial notice without converting Defendants' motion into one for summary judgment. *See Kostrzewa, supra.*

3    "Discretionary functions," as used in evaluating claims of qualified immunity, involve "significant decision-making that entails personal deliberation, decision and judgment." *Davis v. Holly*, 835 F.2d 1175, 1178 (6th Cir. 1987). By contrast, "ministerial functions," for which there is no immunity, involve "the execution or implementation of a decision and entail only minor decision-making." *Id.*

4    Indeed, aside from citations in support of the standard of review, Plaintiff has offered no authority, statutory or otherwise, in support of any of his arguments.

---

Case: 24-1615   Document: 23   Filed: 10/01/2024   Page: 76

Murray ex rel Morrow v. Metropolitan Government of Nashville, Not Reported in...

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Hollis v. Estes,  M.D.Tenn.,  January 31, 2011

2007 WL 1521004

Only the Westlaw citation is currently available.

United States District Court,

M.D. Tennessee,

Nashville Division.

Lisa MURRAY, individually, and on
behalf of her minor children, Michael
MORROW and Tinisha Morrow, Plaintiffs,

v.

The METROPOLITAN GOVERNMENT OF
NASHVILLE, Davidson County, Officer Jason
Hunter, and Unknown Officers, Defendants.

No. 3:06-0570.
|
May 21, 2007.

## Attorneys and Law Firms

Jack Akin Butler, Butler, Kohl & Faulkner, Patrick G. Frogge, Richard L. Tennent, Bell, Tennent & Frogge, PLLC, Nashville, TN, for Plaintiffs.

Francis Howard Young, James W.J. Farrar, Rita M. Roberts-Turner, Cynthia E. Gross, Metropolitan Legal Department, Nashville, TN, Lawrence Alan Poindexter, Rochelle, McCulloch & Aulds, Lebanon, TN, for Defendants.

### *MEMORANDUM*

ROBERT L. ECHOLS, United States District Judge.

**\*1** Pending before the Court is the Motion for Summary Judgment filed by the Defendant Metropolitan Government of Nashville and Davidson County ("Metropolitan Government") (Docket Entry No. 14). Also pending is the Motion for Summary Judgment filed by the Defendant Jason Hunter ("Officer Hunter") (Docket Entry No. 18). Both motions have been fully briefed by the parties.

### I. *FACTS*

The facts relevant to the Motions for Summary Judgment are undisputed by the parties.[1] They are as follows.

On April 28, 2005 at 4:59 p.m., the Metropolitan Government's Emergency Communications Center received a 911 call from Collice Goldthreate ("Goldthreate") reporting a "person with a weapon." Goldthreate gave an address of 309 Claymille Place and reported that a 16 or 17 year old male black named Michael was pointing a gun at his sister two houses away. Michael was identified as wearing a white sweatshirt over a gray top and black pants.

Officers Jason Hunter and Joel Rowney of the Metropolitan Police Department responded to the call and went to 309 Claymille Place in separate cars. Upon arrival, Officer Hunter spoke with Goldthreate. Goldthreate told Officer Hunter that she saw Michael Morrow ("Michael") point a gun at his sister in the front yard of 304 Claymille Place. Goldthreate's daughter, Remi Goldthreate, confirmed that she too saw what appeared to be a pistol.

Both officers went to 304 Claymille Place. As the officers approached the house, they drew their guns. Officer Rowney went down the driveway on the left side of the house and approached the backyard, and he saw a young man who matched the description of the armed suspect come out of the back door of the house onto the elevated wooden deck to take out the trash.

Officer Rowney pointed his pistol at Michael and said, "Freeze. Drop the bag and put your hands up." (Def. SOF ¶ 5). Officer Rowney then instructed Michael to move towards the deck steps and come down the steps slowly. When Michael reached the bottom of the steps, Officer Rowney ordered him to get on the ground and put his hands over his head. Michael complied with the order.

According to Michael, Officer Hunter then approached him and "put his foot on my back and cocked the shotgun and kind of swung it over my head [.]" (Def. SOF ¶ 6).[2] Officer Hunter never touched the shotgun to any part of Michael's body.

While Michael was on the ground, Officer Rowney asked him "where the gun was." Michael told Officer Rowney that he and his siblings had only been playing with water guns and toy guns. The officers then let Michael get up off the ground on his own.

Case: 24-1615   Document: 23   Filed: 10/01/2024   Page: 77

Murray ex rel Morrow v. Metropolitan Government of Nashville, Not Reported in...

While the events were unfolding outside, one of Michael's sisters, Tanisha Murrow, [3] was in the house, looking out a window. Seeing Michael on the ground, she went out the back door onto the back deck. According to Tanisha, after she exited the house onto the elevated deck, Officer Rowney, who was standing on the driveway, pointed his gun up at her and told her to go back inside the house. Tanisha admits that the gun never touched her. Tanisha then went inside and called her mother, plaintiff Lisa Murray, and told her that the police were outside with Michael.

**\*2** The officers then walked with Michael back up the driveway along the side of the house and around to the front porch. Officer Hunter asked Michael where the toy gun was located, and Michael told him it was in his pocket. According to Michael, Officer Hunter "was talking to me calm, eye to eye." Michael removed the toy gun from his pocket and gave it to Officer Hunter. After about 5 seconds, Officer Hunter gave the toy gun back to Michael.

Officer Rowney told Michael to sit on the front porch, and Tanisha then came out onto the front porch and told Officer Hunter that her mother, Lisa Murray, was on the phone and wanted to speak to him. Officer Hunter stepped just inside the front door of the house and spoke to Lisa Murray for "a minute or two" about the events which had just occurred. Lisa Murray was upset that a gun had been pointed at her son and directed profanity at Officer Hunter as she complained about the incident.

After Officer Hunter completed the phone call, Officer Rowney got in his car, and drove away. Officer Hunter went across the street to talk with Goldthreate and explained to her that Michael only had a toy gun in his possession.

Officer Hunter returned to his car and was still sitting in his vehicle when Lisa Murray returned home. Through the open window of Officer Hunter's patrol car, Lisa Murray again cursed at Hunter as she protested his actions with her son. She threatened to sue him and the police department, and demanded his name, badge number, and his sergeant's name and phone number. Officer Hunter gave her the information requested. Lisa Murray then went to the police precinct in an unsuccessful attempt to speak with Officer Hunter's sergeant. However, a few days later, Officer Hunter's sergeant called Lisa Murray and took her complaint over the phone.

During this incident on April 28, 2005, the officers never placed a gun against Michael's head or any other part of his body, nor did they threaten him, curse him, place him in handcuffs or tell him he was under arrest. Once the officers determined Michael had only been using a toy gun while playing with his sister, they told him he could get up off the ground, and he did so on his own, without the officers touching him. According to Michael, the officers never patted him down in order to feel for a gun. Neither officer threatened him, struck him, pushed him, grabbed at him or cursed at him.

Shortly after the incident, Michael complained that he felt dizzy, lightheaded, and his chest hurt, so his mother took him to Skyline Medical Center. The doctor at Skyline told Lisa Murray and Michael that he had an enlarged heart and he should not play sports.

Five days after the incident, on May 3, 2005, Michael was seen by Thomas P. Doyle, M.D., an Associate Professor of Pediatrics at the Pediatric Cardiology Clinic at Vanderbilt University. Dr. Doyle noted that Michael complained about first experiencing chest pain while he was playing basketball. Dr. Doyle was unsure of the etiology of Michael's pain but it was "non-cardiac in nature." In his treating notes, Dr. Doyle did not even mention the incident with the police officers as possibly causing Michael's symptoms. [4]

**\*3** Neither Michael, nor his sister, Tanisha, ever saw a psychologist, psychiatrist, or counselor as a result of the incident on April 28, 2005. Further, Lisa Murray was not injured as a result of the incident.

Based upon the foregoing events, Plaintiff Lisa Murray filed suit on behalf of herself and Michael and Tanisha in the Circuit Court for Davidson County, alleging Fourth Amendment violations under 42 U.S.C. § 1983, along with state law claims for outrageous conduct, assault and battery, the intentional infliction of emotional distress, and negligence. [5] Because of the federal claims, the case was removed to this Court. The pending Motions for Summary Judgment followed.

## II. *STANDARD OF REVIEW*

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Covington v. Knox County School Sys.,* 205 F.3d 912, 914 (6th Cir.2000). The moving party bears the initial burden of satisfying the Court that the

Case: 24-1615    Document: 23    Filed: 10/01/2024    Page: 78

Murray ex rel Morrow v. Metropolitan Government of Nashville, Not Reported in...

standards of Rule 56 have been met. *See Martin v. Kelley,* 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986); *Covington,* 205 F.3d at 914 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed.R.Civ.P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

### III. *APPLICATION OF LAW*

#### A. *FEDERAL CLAIMS*

Plaintiffs bring federal claims under 42 U.S.C. § 1983, alleging unreasonable seizure and excessive force in violation of the Fourth Amendment. They also seek to hold the Metropolitan Government liable for the actions of its officers.

##### 1. *Unreasonable Seizure*

Plaintiffs contend that Michael (and perhaps Tanisha) were subjected to an unreasonable seizure as a result of the officers' display of weapons. Because they cannot show that the seizure was unreasonable within the meaning of the Fourth Amendment, Defendants are entitled to summary judgment on this claim.

**\*4** The Sixth Circuit has recently reviewed the Fourth Amendment jurisprudence surrounding seizures as follows:

The Fourth Amendment unquestionably prevents unreasonable seizures of persons. Where an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen ... a 'seizure' has

occurred." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)[.] In effect,

a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure ... would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870. Such seizures-known as *Terry* stops-do not violate the Fourth Amendment where the officer "possesses a reasonable and articulable suspicion that a person has been involved in criminal activity" and, in such situations, the officer can briefly detain the person "to investigate the suspicious circumstances." *United States v. Heath,* 259 F.3d 522, 528 (6th Cir.2001)[.] A showing insufficient to constitute probable cause can nevertheless justify a *Terry* stop "*[b]ecause of* the limited nature of the intrusion." *United States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (emphasis added).

Under *Terry,* courts examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20[.] Courts evaluate the reasonableness of such seizures in light of the "balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brignoni-Ponce,* 422 U.S. at 878, 95 S.Ct. 2574[.]

*Center for Bio-Ethical Reform, Inc. v. City of Springboro,* 477 F.3d 807, 826 (6th Cir.2007)(internal string citations omitted).

In this case, contrary to the Metropolitan Government's position, there can be little doubt but that Michael was seized, albeit momentarily. The facts viewed in Plaintiff's favor show that upon exiting the house, Michael, at the point of guns (including a shotgun), was ordered to place the bag of garbage on the deck, come down the stairs, and lie on the ground. Certainly, "a reasonable person would have believed that he was not free to leave" *United States v. Mendenhall,* 446 U.S. 544, 554 (1960) in these circumstances.

Case: 24-1615    Document: 23    Filed: 10/01/2024    Page: 79

Murray ex rel Morrow v. Metropolitan Government of Nashville, Not Reported in...

The fact that Michael was seized, however, does not end the inquiry "for what the Constitution forbids is not all searches and seizures but unreasonable searches and seizures." *Elkins v. United States,* 364 U.S. 206, 222 (1960); *see, United States v. Maddox* 388 F.3d 1356, 1361 (10th Cir.2004)("The Fourth Amendment does not prohibit all searches and seizures; rather, only unreasonable searches and seizures are prohibited"). Indeed, *Terry* permits a limited investigatory stop based upon reasonable suspicion.

**\*5** "Reasonable suspicion is, of course, a 'somewhat abstract' concept." *Smoak v. Hall,* 460 F.3d 768, 778 (6th Cir.2006) (citation omitted). "It requires more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause, and 'falls considerably short of satisfying a preponderance of the evidence standard.' " *Id.* Hence, "[i]f an officer possesses 'a particularized and objective basis for suspecting the particular person ... of criminal activity based on 'specific and articulable facts' he may conduct a *Terry* stop." *Id.* at 778-779. Whether reasonable suspicion exists to conduct a *Terry* stop is determined from the totality of the circumstances. *Id.* at 779.

In this case, the totality of the circumstances supports the propriety of the officers conducting a *Terry* stop. Officers had received a dispatch regarding a "person with a weapon call." The description of the subject was a 16 or 17-year old black male wearing a gray top, white sweatshirt, and black pants. Upon arrival at the scene, the caller confirmed to the officers that she had seen an 16 or 17-year old black male pointing a gun at his sister. The caller's daughter stated that she too saw what she thought to be a gun.

With this information, it was reasonable to proceed to the suspect's house and walk up the driveway with guns drawn. "This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop." *United States v. Heath,* 259 F.3d 522, 530 (6th Cir.2001). This is in keeping with the Supreme Court's statement in *Terry* that police officers are not "required to take unnecessary risks in the performance of their duties." *Terry,* 392 U.S. at 23. "Indeed, police officers may use reasonable means to protect themselves when conducting a *Terry* stop, including drawing weapons if the officers believe the suspect may be armed." *United States v. Lindsey,* 114 Fed.Appx. 718, 721-722 (6th Cir.2004) (citing, *United States v. Hardnett,* 804 F.2d 353, 357 (6th Cir.1986)).

Michael was on the ground only momentarily and then allowed to stand up on his own accord and walk to the front porch. He was never placed in handcuffs and upon showing the officers the toy gun in question, the investigative stop ended shortly thereafter. As a matter of law, this detention did not violate the Fourth Amendment and Defendants are entitled to summary judgment on Michael's claim of unlawful seizure. *See, United States v. Swift,* 220 F.3d 502, 509 (7th Cir.2000)(under Fourth Amendment, "an officer may have his gun drawn and order a suspect to lie prone on the ground, handcuff, and frisk him if the officer reasonably believes the suspect is dangerous); *Crisp v. City of Kenton,* 1998 WL 180561 (6th Cir.1998)(summary judgment appropriate in Section 1983 case where, responding to a call of a possible burglary of a pigeon coop, police officers, with guns drawn, ordered suspects to the ground and handcuffed them, even though all of the suspects were lawfully emptying pigeon coop); *United States v. McMurray,* 34 F.3d 1405, 1410-1411 (8th Cir.1994)("officers conducting valid investigative detention may draw their weapons in situations involving potential danger to the officers").

**\*6** The Defendants are also entitled to summary judgment on any claim by Tanisha that she was subjected to an unlawful seizure. All the evidence shows with regard to her is that after Michael was placed on the ground, she walked onto the back deck, a weapon was pointed at her, and she was told to go back into the house. Assuming that Tanisha was seized (i.e., because she was not free to leave the house), any such seizure was reasonable. At the time she exited the house, officers were dealing with a potentially armed suspect and it was reasonable for them to have their weapons drawn. It was also reasonable for them to point their weapons at Tanisha and order her back into the house since they were in the midst of a potentially volatile situation. *See, Reeves v. Alex Churchich,* 2007 WL 1196502 (10th Cir.2007)(summary judgment proper in Section 1983 action where, during course of dealing with possibly armed suspect at a duplex, other resident of duplex came out and a police officer pointed his rifle at the resident and ordered her back into the duplex).[6]

### 2. *Excessive Force*

In addition to claiming unreasonable seizure, Plaintiffs claim that Michael and Tanisha were subject to excessive force in violation of the Fourth Amendment. This claim is based upon the officers pointing their weapons at Michael and telling him to come down the steps and get on the ground, and pointing a weapon at Tanisha and telling her to go back into the house.

Case: 24-1615    Document: 23    Filed: 10/01/2024    Page: 80

Murray ex rel Morrow v. Metropolitan Government of Nashville, Not Reported in...

Standing alone, drawing a weapon on an individual does not necessarily mean that excessive force has been used and the question of the propriety of such force can be resolved on summary judgment. *Anderson v. Antal,* 1999 WL 717993 at * *4-5 (6th Cir.1999). Indeed, "[s]everal courts have determined that pointing a gun in the direction of a suspect or occupant is insufficient to sustain a claim of excessive force." *Ratliff v. City of Three Rivers,* 2007 WL 475191 at *10 (W.D.Mich.2007)(collecting cases).

Regardless, "[a]s with the seizure inquiry, when assessing the reasonableness of the degree of force used by officers in effectuating a *Terry* stop, this court must consider the totality of the circumstances known to the officers prior to the use of force ." *Fisher v. Hardin,* 398 F.3d 837, 854 (6th Cir.2005). The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]" *Graham v. Connor,* 490 U .S. 386, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments ... about the amount of force that is necessary in a particular situation." *Id.*

At the time Michael exited the house, the officers were aware that an individual matching Michael's description had allegedly been pointing a gun at his sister. When Tanisha exited the house, the officers were dealing with Michael and had yet to contain the situation or determine that what Michael possessed was in fact a toy gun. For all the officers knew at the time their guns were drawn, they were dealing with an individual with a real weapon, and the officers did not know how the suspect would react upon encountering uniformed officers. They also did not know how Tanisha fit into the dynamics of the situation. Under these circumstances, the actions of the police officers do not constitute excessive force under the Fourth Amendment. *See, Reeves,* 2007 WL 1196502 at *12 (where officers were trying to apprehend a potentially armed suspect at duplex, it was reasonable for them to have their weapons displayed and ready, and officers did not use excessive force by pointing gun at individual who exited from adjoining duplex and told her to go back inside); *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force,* 379 F.3d 293, 298 (Cir.2004)(no excessive force used where narcotics agents wrongfully entered 67-year old's home with guns drawn during "round up" of drug suspects); *Collins v. Nagle,* 892 F.2d 489, 497 (6th Cir.1989)(officers did not use excessive force by pointing gun at bystander who

was approaching scene of arrest given police could not know bystander's intentions); *Ingram v. Basile,* 2006 WL 1431048 at *4 (N.D.Ill.2006)("it can hardly be said that an officer approaching a suspected drug dealer with his weapon drawn acts with excessive force" since drug dealers are often armed and this remained so even though officers slammed suspect into car in the process of arresting him). [7]

**\*7** Given the facts which have been presented, Defendants are entitled to summary judgment on Plaintiffs' excessive force claim.

### 3. *Municipal Liability*

Because this Court concludes that no triable issue of fact exists on Plaintiff's federal claims with respect to the actions of the individual police officers, Plaintiffs' federal claims against the Metropolitan Government necessarily fail. *Napier v. Madison County,* 238 F.3d 739, 742 (6th Cir.2001). Regardless, the Metropolitan Government is entitled to summary judgment because Plaintiffs have not shown a pattern, policy or custom by the Metropolitan Government to deprive individuals of their constitutional rights.

Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior. Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 692-94 (1978). Instead, "a municipality can be liable under § 1983 only where its policies are 'the moving force [behind] the constitutional violation .' " *Canton v. Harris,* 489 U.S. 378, 389 (1989) (citation omitted). Therefore, "a plaintiff who sues a municipality for a constitutional deprivation under § 1983 must prove that the municipality's policy or custom caused the alleged injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.,* 455 F .3d 690, 699 (6 th Cir.2006).

In their Complaint, Plaintiffs allege that the Metropolitan Government "has a custom, practice or policy, executed by its police department, of unlawfully seizing citizens, at gun point, absent probable cause or other legal justification" and that Michael and Tanisha were deprived of their Fourth Amendment rights as a result of this custom, policy or practice. (Complaint ¶ 17). They also claim that the Metropolitan Government "has a custom, practice or policy, executed by its police department of using the lethal threat of lethal force inappropriately against citizens who are not engaged in criminal activity" and that "[t]his custom, practice or policy is a product both of the training and guidance given

Case: 24-1615    Document: 23    Filed: 10/01/2024    Page: 81

Murray ex rel Morrow v. Metropolitan Government of Nashville, Not Reported in...

to various police officers, and the inadequacy of such training and guidance." (*Id.* ¶ 18).

In an effort to prove the existence of a policy or custom of the Metropolitan Government, Plaintiff points to a report from Sergeant Campbell Sowell ("Sgt.Sowell"), Officer Hunter's supervisor, in which Sgt. Sowell wrote:

> I don't believe the department has any reason to apologize on behalf of the officers involved.... I believe the officers acted within the boundaries of the law, and were justified in having their weapons out. The officers never used physical force or foul language in resolving this incident. It's readily apparent that Ms. Murray does not know the proper way to respond to an armed individual. The fact that her son was carrying a toy gun is not an assumption police officers can make. Police officers must assume the call is legitimate until discovered otherwise.

**\*8** (Docket Entry No. 21 at 2). From this, Plaintiffs contend that Sergeant Sowell, in evaluating Officer Hunter's actions, "determined that Officer Hunter had acted within the bounds of police policy, in pointing a gun at an unarmed child without seeing the child threaten deadly force." (Id.). Plaintiffs also argue that because both officers involved in the incident filed reports in which they indicated they believed they acted appropriately under the circumstances, this shows they acted "within the bounds of police policy." (*Id.*).

Defendants quite aptly describe the foregoing arguments as "specious." (Docket Entry No. 27). The fact that the officers involved and their supervisor believed the officers acted appropriately does nothing to show an unconstitutional custom, policy, or practice. For purposes of section 1983, custom and practice connote a policy and practice which is longstanding or deeply imbedded so as to " 'avoid de facto *respondeat superior* liability expressly prohibited by *Monell.*' " *Cash v. Hamilton County,* 388 F.3d 539, 543 (6 th Cir.2004) (citation omitted). Further, the fact that the officers acted as they did in the situation presented does nothing to show improper training. *See, Miller v. Calhoun County,* 408 F.3d 803, 815 (6 th Cir.2004)( "Mere allegations that

an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability."). Summary judgment will be granted on the municipal liability claim.

## B. *STATE LAW CLAIMS*

Having concluded that the Plaintiffs' federal claims should be dismissed, the Court "has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1254 (6th Cir.1996). In deciding whether to exercise its supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.,* 994 F .2d 1178, 1182 (6th Cir.1993). In this case, the balance tips decidedly in favor of addressing the state law claims since the parties have conducted discovery, the case is before the Court on Motions for Summary Judgment, and trial is scheduled for June 2007. It would not serve the interest of judicial economy to refuse to rule on the state law claims at this late date.

In their opposition papers, Plaintiffs do not even address the state law claims. Accordingly, "the court is under no duty 'to search the entire record to establish that it is bereft of a genuine issue of material fact.' " *Spurlock v. Whitley,* 2003 WL 223764617, *2 (6 th Cir.2003) (citation omitted).

### 1. *Outrageous Conduct and Intentional Infliction of Emotional Distress*

In Tennessee, "[o]utrageous conduct and intentional infliction of emotional distress are different names for the same cause of action" and hence "the two names are used interchangeably." *Nairon v. Holland,* 2007 WL 626953 at *4, n. 1 (Tenn.Ct.App.2007). The tort of outrageous conduct in Tennessee exists only where (1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury. *Swallows v. Western Elec. Co.,* 543 S.W.2d 581, 582-83 (Tenn.Ct.1976). "Generally, 'the case involves facts which would arouse the resentment of an average member of the community and lead him to exclaim, "Outrageous!" *Sayer v. Memphis Educ. Ass'n,* 2006 WL 3298326 at *6 (Tenn.Ct.App.2006) (quoting *Chandler v. Prudential Ins. Co.,* 715 S.W.2d 615, 622 (Tenn.Ct.App.1986)). Hence, it is not sufficient that a

Case: 24-1615    Document: 23    Filed: 10/01/2024    Page: 82

Murray ex rel Morrow v. Metropolitan Government of Nashville, Not Reported in...

defendant "has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress." *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn.1997).

**\*9** Cases finding outrageous conduct include a mother being shown her deceased baby preserved in formaldehyde in a jar, *Johnson v. Woman's Hospital,* 527 S.W.2d 133 (Tenn.Ct.App.1975), a mother being erroneously informed her daughter's death was the result of sexual assault and suffocation, *Dunbar v. Strimas,* 632 S.W.2d 558 (Tenn.Ct.App.1981), and a photo store employee informing a woman that her film could not be developed when in fact the employee kept the nude photographs and showed them to acquaintances of the customer, *Dunn v. MotoPhoto, Inc.,* 828 S.W.2d 747 (Tenn.Ct.App.1991).

Here, the facts agreed to by the parties do not rise to this level or constitute such extreme, outrageous conduct which would be beyond the pale of decency. Further, there has been no evidence presented that any of the Plaintiffs suffered serious mental injury as a result of the incident on April 28, 2005. Accordingly, the outrageous conduct/intentional infliction of emotional distress claims will be dismissed.

**2. *Assault and Battery***

Under Tennessee law, officers are not prohibited from utilizing force against a suspect. Instead, an officer "may use the force reasonably necessary" to apprehend a suspect, "with due regard to other attendant circumstances, such as his own safety or that of others present." *City of Mason v. Banks,* 581 S.W.2d 621, 625 (Tenn.1979). Tennessee courts may look to federal case law on excessive force in analyzing claims of assault and battery by police officers. *Baker v. Snyder,* 2006 WL 2654163 at \*6 (E.D.Tenn.2006).

In this case, the Court has already found that the officer's display of weapons was reasonable under the circumstances and did not amount to excessive force. The only claim of any physical touching is Michael's statement in his deposition that

when he got down on the ground, one of the officers told him to place his hands over his head and "kind of put his foot on my back[.]" (Michael Morrow Depo. at 12). This is insufficient to create a triable jury issue. *See, Nolin v. Isbell,* 207 F.3d 1253, 1258 (11 th Cir.2000)(officer's use of force was *de minimis* and no triable issue existed where evidence showed that officer grabbed arrestee, shoved him a few feet against a vehicle, pushed his knee into the arrestee's back, pushed him against van and searched arrestee's groin area in an uncomfortable manner); *Long v. Pend Oreille County,* 2006 WL 2850011 at \* 10 (E.D.Wash.2006)("alleged injuries reflecting only minimal force are insufficient to qualify as constitutionally excessive"); *Bowles v. State,* 37 F.Supp.2d 608, 612 (S.D.N.Y.1999)(dismissal warranted where plaintiff alleged that he was pushed and shoved by officer during search incident to arrest).

**3. *Negligence***

While Plaintiffs allege negligence in their Complaint, the Complaint speaks entirely in terms of intentional conduct on behalf of the Defendants. In any event, Plaintiffs have failed to establish a breach of a duty, necessary elements of a negligence action. *West v. East Tennessee Pioneer Oil Co.,* 172 S.W.3d 545, 550 (Tenn.2005). Accordingly, summary judgment will be granted on this claim.

**IV. *CONCLUSION***

**\*10** For the foregoing reasons, the Motions for Summary Judgment filed by the Defendants (Docket Entry Nos. 14 & 18) will be granted. This case will be dismissed with prejudice.

An appropriate order will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1521004

---

## Footnotes

1    The Metropolitan Government has filed a "Statement of Undisputed Material Facts" (Docket Entry No. 16), consisting of 27 numbered paragraphs. With respect to 26 of those facts, Plaintiffs have indicated that they are "admitted for the purposes of the Motion for Summary Judgment" (Docket Entry No. 22). However with

Case: 24-1615   Document: 23   Filed: 10/01/2024   Page: 83

Murray ex rel Morrow v. Metropolitan Government of Nashville, Not Reported in...

respect to the factual allegations contained in paragraph number 24, Plaintiffs provide no response which, under Local Rule 56.01(g), means that it is not disputed. Accordingly, the Court's recitation of the facts is based upon the Statement of Undisputed Material Facts filed by the Metropolitan Government.

2   Though the agreed-to statement of facts indicates that both officers had their guns drawn, apparently Officer Hunter was carrying a shotgun.

3   In the Complaint, Tanisha Murrow is identified as Tinisha Murrow. However, other filings in this case repeatedly refer to her as Tanisha. In her deposition, she spelled her name "T-a-n-i-s-h-a" (Docket Entry No. 14, Ex. G, at 5). Accordingly, the Court will utilize "Tanisha" in the body of this opinion.

4   This is part of the statement of fact contained in paragraph number 24 of Defendants' Statement of Undisputed Material Facts to which Plaintiff provided no response (see footnote number 1). The statement further alleges that Dr. Doyle did not note the event with the police "most likely because neither Michael nor his mother mentioned to Dr. Doyle that they thought the incident with the police officers caused Michael's symptoms." Regardless of whether Plaintiffs agree with this statement, this allegation is not important to the Court's resolution of the pending Motions for Summary Judgment.

5   The Complaint names as Defendants the Metropolitan Government, Officer Hunter and an "Unknown Officer." The "Unknown Officer" is presumably a reference to Officer Rowney. However, he was never named as a Defendant or served with the Complaint. Accordingly, only the liability of the Metropolitan Government and Officer Hunter is before the Court, although the same claims against Officer Rowney would be subject to dismissal for the same reasons that they are being dismissed as to Officer Hunter.

6   Because this Court concludes that Plaintiffs cannot show that their constitutional rights were violated, Officer Hunter would be entitled to qualified immunity in any event. *See, Charvat v. East Ohio Regional Wastewater Auth.,* 246 F.3d 606, 616 (6th Cir.2001)(first prong of the qualified immunity analysis requires plaintiff to show the violation of a constitutionally protected right).

7   Plaintiffs' reliance on *Humphry v. Mabry,* 2007 WL 957354 at *6 (6th Cir.2007) and *Flores v. City of Palacios,* 381 F.3d 391, 399 (5th Cir.2007) is misplaced. In *Humphry,* the Sixth Circuit found that police officers were entitled to qualified immunity on a claim alleging excessive force under Section 1983, even though the record showed that the officers forcibly removed a driver from his vehicle at gunpoint, conducted a pat-down search, and handcuffed him based upon a caller's report of a man with a gun and a subsequent indication that the suspect was driving a similar vehicle. *Humphry* actually supports this Court's conclusion.

In *Flores,* the district court properly found that a genuine issue of material fact existed on an excessive force claim where evidence showed an officer fired his weapon at the driver of a car who was allegedly parked on the wrong side of the street and did not heed the officer's command to stop. *Flores* involved the use of deadly force and the facts in this case obviously are markedly different.

2006 WL 2135761

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

Cordell D. WYATT and Suzanne M. Wyatt,
Individually and as Next Friend of Bianca
Wyatt, Alicia Wyatt, Chentelle Wyatt, and
Michael Sandusky, Minors, Plaintiffs-Appellees,
v.
Sergeant John BLAIR, Officer Anthony
Chicko, Corporal Jon Gersky, and Officer
Robert Robinson, Defendants-Appellants,
and
Sergeant Harold Stockton, Deputy Michael Royal,
Deputy Mark Grant, Deputy Allen Bernzansky, Deputy
Michael Pentsil, Deputy David De Sautels, Officer
Hussain Frahat, Officer Warren Jones, Sergeant Coaglio,
Officer Carolyn Huggins, Officer Gordy May, State of
Michigan, County of Wayne, City of Taylor, Township
of Brownstown, and City of Romulus, Defendants.

Docket No. 259750.
|
Aug. 1, 2006.

Wayne Circuit Court; LC No. 02-212713-NI.

Before: SMOLENSKI, P.J., and HOEKSTRA and
MURRAY, JJ.

[UNPUBLISHED]

PER CURIAM.

**\*1** Defendants John Blair, Anthony Chicko, Jon Gersky
and Robert Robinson, each of whom are officers of the
Taylor Police Department, appeal as of right the trial court's
order denying their motion for summary disposition based
on governmental immunity, MCR 2.116(C)(7), and failure to
create a genuine issue of material fact, MCR 2.116(C)(10).
We reverse.

I. Basic Facts and Procedural History

This lawsuit arises from events that occurred during a search
for suspects following the armed robbery of a southeast
Michigan restaurant at approximately 9:45 p.m. on the
night of September 18, 2001. Several police officers from the
Michigan State Police, the township of Brownstown, the
cities of Romulus and Taylor, and the Wayne County Sheriff's
Department were involved in seeking out and apprehending
four armed suspects, including either two African-American
males or an African-American male and female, that had
taken flight into a residential neighborhood. During an
ensuing foot chase of the suspects, several officers were fired
upon by at least one of the suspects. Plaintiffs Cordell and
Suzanne Wyatt subsequently sought out and informed a city
of Romulus police officer that a member of their household
had spotted a suspicious individual in a neighboring yard.
Officers from the various police agencies responded to the
scene, where a canine tracking unit tracked a scent to the rear
of plaintiffs' home.

After returning home to find a number of officers at the rear
of his home, Cordell decided to observe the "commotion"
through two sliding glass doors leading to a deck attached
to the rear of the home. According to the complaint filed
by plaintiffs, upon seeing Cordell, the police officers, "after
having already seen Plaintiff Suzanne M. Wyatt, his wife,
who is Caucasian, drew the conclusion that Mr. Wyatt, an
African-American male, was the suspect, and announced ...
that the suspect was in the house and a hostage situation was
underway." With assault rifles trained at the home, the officers
then ordered the occupants of the house to exit the home,
females first, onto the deck. After exiting the home, several
of the plaintiffs, including sixteen-year-old Bianca Wyatt and
eleven-year-old Chentelle Wyatt, were placed in handcuffs
and taken to the front of the house. Bianca and Cordell, along
with Michael Sandusky, were also placed in a patrol car until
such time as the home was "cleared" and it was confirmed
that none of the occupants of the home were in fact a suspect
in the armed robbery.

Plaintiffs subsequently filed this lawsuit against the
governmental entities and individual officers involved in the
search for the robbery suspects, raising claims of assault
and battery, violation of ministerial duties, false arrest and
imprisonment, negligence, and both intentional and negligent
infliction of emotional distress. Following dismissal of the
various governmental entities on the ground of immunity, the

individual officers of the Taylor Police Department moved for summary disposition of the claims against them, arguing that the evidence established that they too were entitled to immunity, or were otherwise not involved in the acts alleged by plaintiffs to form the basis for their claims, and were therefore entitled to summary disposition under MCR 2.116(C)(7) and (10). The trial court denied the motion, prompting this appeal.

## II. Analysis

### A. Standard of Review and Applicable Law

**\*2** We review a trial court's determination regarding a motion for summary disposition de novo. *MacDonald v. PKT, Inc,* 464 Mich. 322, 332; 628 NW2d 33 (2001). A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. *Spiek v. Dep't of Transportation,* 456 Mich. 331, 337; 572 NW2d 201 (1998). "In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), we consider the affidavits, pleadings, depositions, admissions, or any other documentary evidence submitted in a light most favorable to the nonmoving party to decide whether a genuine issue of material fact exists." *Singer v. American States Ins,* 245 Mich.App 370, 374; 631 NW2d 34 (2001). A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ. *West v. Gen Motors Corp,* 469 Mich. 177, 183; 665 NW2d 468 (2003).

A motion under MCR 2.116(C)(7) "tests whether a claim is barred because of immunity granted by law, and requires consideration of all documentary evidence filed or submitted by the parties." *Glancy v. Roseville,* 457 Mich. 580, 583; 577 NW2d 897 (1998). In making this determination, well-pleaded allegations are accepted as true and construed in favor of the nonmoving party. *Dampier v. Wayne Co,* 233 Mich.App 714, 720; 592 NW2d 809 (1999). "If the facts are not in dispute and reasonable minds could not differ concerning the legal effect of those facts, whether a claim is barred by immunity is a question for the court to decide as a matter of law." *Poppen v. Tovey,* 256 Mich.App 351, 354; 664 NW2d 269 (2003).

An employee of a governmental agency acting within the scope of his or her authority is immune from tort liability unless the employee's conduct amounts to gross negligence that is the proximate cause of the injury. MCL 691.1407(2); see also *Robinson v. Detroit,* 462 Mich. 439, 462; 613

NW2d 307 (2000). Actions of a governmental employee that would normally be considered an intentional tort are also shielded from liability if those actions were "justified," i.e., objectively reasonable under the circumstances. *Butler v. Detroit,* 149 Mich.App 708, 715; 386 NW2d 645 (1986); see also *VanVorous v. Burmeister,* 262 Mich.App 467, 480; 687 NW2d 132 (2004). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results," MCL 691.1407(7)(a), and has been held to suggest an "almost willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks," *Tarlea v. Crabtree,* 263 Mich.App 80, 90; 687 NW2d 333 (2004). Accordingly, evidence of ordinary negligence does not create a material question of fact concerning gross negligence. *Maiden v. Rozwood,* 461 Mich.App 109, 122-123; 597 NW2d 817 (1999). Moreover, to satisfy the causation requirement, the defendant's conduct must be "the one most immediate, efficient, and direct cause" of plaintiffs' injuries. *Robinson, supra.*

**\*3** Plaintiffs do not dispute that the officers responding to plaintiffs' house on September 18, 2001, were acting within the scope of their authority while engaged in a governmental function, i .e., tracking suspects following an armed robbery. See *Tate v. Grand Rapids,* 256 Mich.App 656, 661; 671 NW2d 84 (2003); see also, e.g., *Payton v. Detroit,* 211 Mich.App 375, 393; 536 NW2d 233 (1995). Accordingly, we must determine whether the evidence, when viewed in a light most favorable to plaintiffs, would permit reasonable minds to differ regarding whether defendants' conduct was justified, or amounted to gross negligence that was "the" proximate cause of plaintiffs' injuries. *Robinson, supra; Butler, supra.*

### B. Intentional Tort Claims

With respect to the intentional torts alleged by plaintiffs, defendants assert that they are entitled to governmental immunity for their actions on the night of September 18, 2001, because the circumstances giving rise to plaintiffs' claims justified the officers' decision to secure certain of the plaintiffs. Defendants argue that the evidence leaves little doubt that for the safety of the police officers and plaintiffs, it was necessary to quickly remove plaintiffs from the house, move them to a safe location, and determine whether any one in the house was a suspect in the armed robbery. We agree.

In support of their claims for assault and battery, false arrest and imprisonment, and intentional infliction of emotional

distress, plaintiffs generally alleged that the police officers tortiously "manhandled" and detained them, causing physical and emotional injury. Plaintiffs further alleged that they were needlessly placed in fear for their lives when the police officers aimed assault rifles at them, and that individual plaintiffs suffered emotional distress from either witnessing family members being placed in handcuffs and police cars, or themselves being subjected to such treatment.

On appeal, defendants acknowledge that it was defendant Blair who handcuffed Cordell and Michael while on the rear deck, and that it was Chico who handcuffed then lead Bianca from the home. There is also evidence indicating that Blair "may" also have been the officer who handcuffed Chentelle, and that Robinson was outside the house with his gun drawn at the time plaintiffs were ordered from the home. [1] There is, therefore, at least some evidence to support plaintiffs' claims against defendants Blair, Chico, and Robinson. We note, however, that plaintiffs presented no evidence showing that defendant Gersky was involved in any of the activities that form the basis for their claims. Accordingly, we find that summary disposition of plaintiffs' claims against Gersky was proper under MCR 2.116(C)(10), regardless whether he would be entitled to immunity. See MCR 2.116(G)(4). Regarding the remaining defendants, we further find that because no reasonable observer could conclude that the officers' conduct that evening was unjustified, summary disposition in favor of those defendants was also proper.

**\*4** As recognized by our Supreme Court in *Ross v Consumers Power Co (On Rehearing),* 420 Mich. 567, 659; 363 NW2d 641 (1984), police officers "must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers." See also, e.g., *Graham v. Connor,* 490 U.S. 386, 396-397; 109 S Ct 1865; 104 L.Ed.2d 443 (1989) (recognizing that "police officers are often forced to make split-second judgments ... in circumstances that are tense, uncertain, and rapidly evolving"). The question is whether the officer's exercise of such discretion was objectively reasonable under the circumstances. *VanVorous, supra.*

Applying the foregoing principles to the evidence submitted by the parties, we cannot conclude that a reasonable observer would find defendants' conduct on the evening in question to have been unjustified. Regarding the use of assault rifles to order the occupants from the home, the evidence wholly

supports that the officers were justified in believing that one of the suspects had entered plaintiffs' house, as they had been informed of a suspicious individual in a neighboring yard and a canine unit had tracked the scent to plaintiffs' rear deck. Given the nature of the crime under investigation, i.e., armed robbery, and considering that officers had earlier been fired upon while pursuing the suspected perpetrators of that crime, the officers were similarly justified in perceiving a need to protect both themselves and plaintiffs in the event an armed suspect had in fact entered plaintiffs' house.

Defendants conduct toward Bianca Wyatt was also not objectively unreasonable. Indeed, given that officers had been fired upon earlier, defendants were on a heightened state of alert and needed to react quickly with little time for reflection. The evidence indicates that Bianca admittedly came out of the house screaming "at the top of [her] lungs," and did not immediately follow orders to move off the deck and away from the house. Rather, testimony from witnesses indicates that Bianca, both physically and vociferously, fought the officers' attempts to move her away from the house. As argued by defendants, it would have been foolish not to handcuff an individual in such an emotional state. See, e.g., *People v. Zuccarini,* 172 Mich.App 11, 14; 431 NW2d 446 (1988) (handcuffing and detention of defendant was a reasonable, limited intrusion on the defendant's liberty under circumstances where violence could arise and the risk of harm to the police and others needed to be minimized). Moreover, while there is evidence that, when viewed in a light most favorable to plaintiffs, indicates that restraining Bianca in this manner required that she be forcefully subdued, there is no evidence to indicate that the officers used any more force than necessary under the circumstances. *Id.;* see also, e.g., *Brewer v. Perrin,* 132 Mich.App 520, 528; 349 NW2d 198 (1984). Accordingly, we do not conclude that reasonable minds could differ regarding whether defendants were justified in restraining Bianca in the manner alleged.

**\*5** Given Bianca's admitted emotional state, it was similarly not objectively unreasonable to have placed Bianca into a patrol car until the situation at hand had been resolved by the officers. Furthermore, while there is evidence to indicate that Bianca suffered bruising and swelling as a result of being handcuffed that night, there is no evidence to suggest that she was handcuffed too tightly or was otherwise injured during handcuffing by defendants. When viewed in a light most favorable to plaintiffs, the evidence of record fails to establish a genuine issue of material fact regarding whether defendants' actions in temporarily subduing, handcuffing, and

placing Bianca into a police car were objectively reasonable and necessary to remove Bianca from the situation for both her safety and the safety of others.

While the need to restrain Chentelle was less apparent, the evidence indicates that defendants' conduct in this regard was, nonetheless, also objectively reasonable under the circumstances. The evidence clearly shows that this was a tense and volatile situation, and that Chentelle had disregarded the officers' earlier order to exit the home with the other female occupants, at least one of which had already demonstrated a disruptive and arguably dangerous lack of emotional control. Moreover, there is no evidence to show that Chentelle was subjected to unnecessary force, or that her being restrained by the officers, as opposed to the distress of the entire episode, i.e., being surrounded by officers with guns drawn and seeing her father and siblings led away by the police, caused the mental distress generally asserted by plaintiffs. See *Brewer, supra* at 529 ("[b]y itself the use of handcuffs is not unreasonable force"). As already discussed, the officers responding to the plaintiffs' home were justified in perceiving a general need to secure the home and its occupants. Furthermore, the evidence indicates that Chentelle was placed in handcuffs only for a very brief period of time, was never placed in a police vehicle, and was released almost immediately after being safely moved to the front of the home. Accordingly, we find no genuine issue of material fact regarding whether the defendants' conduct toward Chentelle was objectively reasonable.

The evidence similarly fails to raise a genuine question of fact regarding whether defendants' conduct toward Michael and Cordell was objectively reasonable. We note that Cordell indicated during deposition that he did not believe that the officers did anything inappropriate in securing Michael, and that he understood why he and Michael were initially restrained by defendants. Indeed, the officers were looking for an African-American male and had been shot at earlier. Further, plaintiffs admitted that Michael was visibly upset before exiting the house, and acknowledge that at the time officers believed a hostage situation to be underway. Given that the officers had been informed of a suspicious person in a neighboring yard, and that a canine unit had tracked a scent to the rear of plaintiffs' home, reasonable minds could not differ regarding whether the precautionary tactics employed by defendants until such time as the situation was resolved were objectively reasonable, and thus justified.

**\*6** Consequently, we conclude that even when viewed in the light most favorable to plaintiffs, the evidence does not support a conclusion that the officers acted in other than an objectively reasonable manner under the circumstances. The alleged actions taken here do not rise to the level of objectively unreasonable conduct sufficient to destroy the protection of governmental immunity. As noted, the alleged encounters occurred during a highly charged incident, and without the benefit of hindsight, the facts and circumstances confronting the officers rendered their actions objectively reasonable. See *Graham, supra* at 396 (indicating that the judgment of reasonable officers on the scene should not be subjected to the "20/20 vision of hindsight" but, rather, afforded deference). Therefore, because the officers' conduct does not give rise to an actionable claim, whether arising from direct contact with the officers, or derivatively as a result of viewing the officers action that night, the trial court erred in failing to grant summary disposition of plaintiffs' claims of intentional tort in favor of defendants.

### C. Negligent Tort Claims

In the remainder of their complaint, plaintiffs allege that defendants did not use due care to prevent their false arrest and imprisonment and assault and battery and that, in doing so, defendants violated their ministerial duties as police officers and negligently inflicted emotional distress onto plaintiffs. We note, however, that "this Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *VanVorous, supra* at 483-484, citing *Smith v. Stolberg,* 231 Mich.App 256, 258-259; 586 NW2d 103 (1998) and *Sudul v. Hamtramck,* 221 Mich.App 455, 458, 477; 562 NW2d 478 (1997). Plaintiffs' general claims of negligence and claims of negligence in relation to their claims of violation of ministerial duties and infliction of emotional distress merely reassert their claims of intentional tort. Plaintiffs may not, however, transform these claims into additional claims for gross negligence.[2] *VanVorous, supra.* Therefore, the trial court should also have dismissed plaintiffs' claims of negligence, violation of ministerial duties, and negligent infliction of emotional distress. *Id.*

Reversed.

SMOLENSKI, P.J. (concurring).

SMOLENSKI, P.J.

I concur with the majority's analyses and conclusions.

To the casual observer reflecting on the events of this evening with the benefit of hindsight, the actions of the officers might seem unjustified. Indeed, it seems almost absurd that several officers, including some from defendants' police department, would engage the family in a conversation on their deck while searching for a potentially dangerous suspect, then order the family into their home only to order them out again at gunpoint mere seconds later. It is also peculiar that the officers determined that there was no need to handcuff Suzanne, who was the only Caucasian family member, and yet decided to handcuff the other members of the Wyatt family. [1] It is particularly striking that the officers felt the need to order eleven-year-old Chentelle, who was clothed only in a nightgown with no socks or shoes, to her knees and handcuff her before escorting her to the front of the house. Nevertheless, although these actions might seem unjustified in hindsight, this Court must judge the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 US 386, 396; 109 S Ct 1865; 104 L.Ed.2d 443 (1989); see also *VanVorous v. Burmeister,* 262 Mich.App 467, 480-481; 687 NW2d 132 (2004) (noting that the actions of officers must be judged under a reasonable person standard and considering the totality of the circumstances). Under this standard and given the facts of this case, the officers' actions cannot be said to be without justification.

**\*7** Testimony established that there might have been as many as twenty officers from several different departments in the vicinity of the Wyatt home. These officers were responding with limited information to a confusing, potentially dangerous, and rapidly evolving situation. Adding to this tension and chaos, some of the officers had earlier been fired upon while pursuing the robbery suspects. Under these facts, it is understandable that the officers would draw their weapons and take other precautions after the canine unit indicated that a suspect might be in the vicinity. Furthermore, although there is evidence that officers from defendants' police department actually spoke with the Wyatt family on the deck moments before the events in contention, plaintiffs failed to establish that these officers were the same officers who later ordered the family out of the house and handcuffed them. Therefore, it was reasonable for defendants to treat Cordell and Michael as potential suspects. Further, under the facts of this case, an officer might reasonably conclude that securing the children before moving them to a safer location would be in both the officers' and children's best interests.

For these reasons, I cannot conclude that the officers' actions were unjustified. Therefore, I concur with the majority's conclusion that defendants were entitled to summary disposition of all plaintiffs' claims based on governmental immunity.

**All Citations**

Not Reported in N.W.2d, 2006 WL 2135761

---

## Footnotes

1     Although defendants contend in their brief on appeal that no Taylor police officer had physical contact with Chentelle, we note that the record indicates that Blair admitted to his supervisor that he "may" have been the individual who handcuffed Chentelle.

2     Moreover, even were such "transformation" permissible, for the same reasons it cannot be said that defendants' conduct on the night of September 18, 2001 was not justified, we cannot conclude that a reasonable observer would find defendants' conduct to be "so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(7)(a); *West, supra.*

1     Although Aleshia was never handcuffed, there is testimony that indicates that an officer might have tried to handcuff her.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.